Original

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name **Franks, Raymond**
(Last)            (First)            (Initial)

Prisoner Number **V-08354**

Institutional Address **California State Prison, Solano**
**P.O. Box 4000, Bldg. 12, Cell 234, Vacaville, CA 95696**

FILED
MAR 19 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

SBA

**Raymond Franks**
(Enter the full name of plaintiff in this action.)

vs.

**D.K. Sisto, Warden,**

_____

_____

_____
(Enter the full name of respondent(s) or jailer in this action)

CV 08 1525

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**

(PR)

E-filing

_Read Comments Carefully Before Filling In_

_When and Where to File_

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12      (a)   Name and location of court that imposed sentence (for example; Alameda

13            County Superior Court, Oakland):

14      <u>Superior Court Alameda County</u>     <u>Oakland</u>

15            Court                               Location

16      (b)   Case number, if known __<u>145147</u>_____

17      (c)   Date and terms of sentence __<u>18 years</u>_____

18      (d)   Are you now in custody serving this term?  (Custody means being in jail, on

19            parole or probation, etc.)          Yes __<u>✓</u>__   No _____

20            Where?

21            Name of Institution: <u>California State Prison, Solano</u>

22            Address: <u>P.O. Box 4000, Vacaville, CA 95696</u>

23      2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  <u>Continuous sexual abuse of a child and lewd acts upon</u>

27  <u>a minor. Penal Code §§ 288(a), 288(c)(1), and 288.5(a).</u>

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:               Yes ✓    No _____

    Preliminary Hearing:      Yes ✓    No _____

    Motion to Suppress:       Yes _____    No ✓

4. How did you plead?

    Guilty _____    Not Guilty ✓    Nolo Contendere _____

    Any other plea (specify) __None_____

5. If you went to trial, what kind of trial did you have?

    Jury ✓    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes ✓    No _____

7. Did you have an attorney at the following proceedings:

|  |  |  |  |
|---|---|---|---|
| (a) | Arraignment | Yes ✓ | No _____ |
| (b) | Preliminary hearing | Yes ✓ | No _____ |
| (c) | Time of plea | Yes _____ | No _____ |
| (d) | Trial | Yes ✓ | No _____ |
| (e) | Sentencing | Yes ✓ | No _____ |
| (f) | Appeal | Yes ✓ | No _____ |
| (g) | Other post-conviction proceeding | Yes _____ | No ✓ |

8. Did you appeal your conviction?        Yes ✓    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal        Yes ✓    No _____

        Year: __2005__    Result: __Affirmed_____

        Supreme Court of California    Yes ✓    No _____

        Year: __2005__    Result: __Denied_____

        Any other court        Yes _____    No ✓

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                    Yes __✓__    No_____

(c)    Was there an opinion?                 Yes __✓__    No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

Yes _____    No__✓__

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?          Yes __✓__    No_____

[Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition.  You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following

questions for each proceeding.  Attach extra paper if you need more space.

I.    Name of Court: _California Supreme Court_

Type of Proceeding: _Habeas Corpus_

Grounds raised (Be brief but specific):

a. _The Court erred in instructing the jury with CALJIC No. 2.212_

b. _The Court erred in failing to give CALJIC No. 17.10_

c. _Incompetence of trial Counsel_

d. _____

Result: _Denied_                    Date of Result: _2/7/07_

II.   Name of Court: _Alameda County Superior Court_

Type of Proceeding: _Habeas Corpus_

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

a. _Ineffective Assistance of Appellate Counsel_

b. _Ineffective Assistance of trial Counsel_

c. _____

d. _____

Result: _Denied_____ Date of Result: _1/22/08_

III.  Name of Court: _None_____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result:_____

IV.  Name of Court: _None_____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result:_____

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _✓_  No____

Name and location of court: _California Court of Appeal for the First Appellate District (Please refer to accompanying motion to stay and hold)_

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One: Please refer to Page 6(1)

6

7   Supporting Facts: Please refer to subsequent Pages - Pages 6(1) - 6(4)

8

9

10

11  Claim Two: Please refer to subsequent Page - Page 6(5)

12

13  Supporting Facts: Please refer to subsequent Pages - Pages 6(5) - 6(8)

14

15

16

17  Claim Three: Please refer to subsequent Page - Page 6(9)

18

19  Supporting Facts: Please refer to subsequent Pages - Pages 6(9) - 6(11)

20

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  N/A

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 6 -

# STATEMENT OF THE FACTS

## Prosecution Case

**A.    Background.**

Audrey Franks had two children, Allena and Sam, by her first husband, Allen McCain. (RT 377-378, 420-421.) She later had another child, Ashlee, by another man while she was in the military but still married to Mr. McCain. (RT 377, 422, 457-460.) For several years, Allena and Sam lived with their father, Mr. McCain, in Sacramento. (RT 424, 509.) Ashlee lived with Audrey's sister in Sacramento for several years. (RT 424.)

Appellant and Audrey Franks met in 1993 and they married in 1996. (RT 425-426.)[1] In June of 1996, they moved into an apartment on East 18th Street in Oakland. (RT 426-427, 455, 469.) In July of 2000, soon before the first incident reported by Allena, Allena and Sam left Sacramento and moved in with them. (RT 427-428.) Around November 17, 2001, the family moved into a house on 66th Avenue. (RT 437-438, 470.) In June 2002, Ashlee left Sacramento and moved in with the family in Oakland. (RT 383, 439, 494.)

Appellant worked as an ironworker when jobs were available, and

---

[1] Appellant was born on September 19, 1960. (RT 714.)

he ran a landscaping business. (RT 413, 494-456.) He was also a minister at the Friendship Christian Church, having been involved with the church since 1995. (RT 429-430.) Appellant had been abusive of Audrey in the past, but this largely stopped in 1995 or 1996, after he was saved in the church. (RT 430-431; see also RT 443-447, 484.) They still went to marriage counseling with their church pastor, Pastor Agee. (RT 431-432.)

## B.    Allena (Counts I-III).[2]

Born July 18, 1987, Allena moved in with appellant and her mother in Oakland in July of 2000, right around her 13th birthday. (RT 420, 523-524.) On one occasion in the Oakland apartment, she recalled falling asleep in the living room. (RT 527, 531.) She was awakened by appellant rubbing her chest, at first over her clothes. (RT 527-529.) Then he lifted her shirt and massaged her chest skin-to-skin. (RT 530.) He also put his mouth to her chest and started sucking. (RT 530.) This occurred when she was 13 years old, soon after she moved in and before school started in the

---

[2] Count I alleged continuous abuse based on three or more acts committed between July 25, 2000, soon after Allena moved to Oakland, and July 18, 2001, her 14th birthday. Count II alleged a lewd touching occurring between July 18, 2001, after she was 14, and October 31, 2001, i.e., around the time when the family moved to the house. Count III alleged a lewd touching between November 1, 2001 and December 24, 2001, occurring in the house. Allena testified there were other incidents, but only these five touchings were described in any detail.

fall.  (RT 531-532, 629.)[3]

On another occasion at the apartment before she turned 14, appellant touched her at night when she was on the top bunk bed above her brother Sam.  (RT 533, 535-536, 604, 633.)  He massaged her chest over her clothing, then skin-to-skin.  (RT 537.)  He also sucked on her nipple.  (RT 538-539.)  After he left the room, she heard him flush the toilet.  (RT 539.)  She heard her mother ask appellant what he was doing.  (RT 539.)  Then her mother came in, asked why she was not asleep, and touched her chest to feel her heartbeat.  (RT 540-541.)

On another occasion at the apartment before she turned 14, she was sleeping on the couch.  (RT 541-542.)  She recalled appellant propped her right leg up and began massaging her chest.  (RT 542-545.)  This time he also pulled her pants and underwear down and touched her vaginal area with his hand.  (RT 545-546.)  He did not put his hand inside, but he rubbed in between her labia.  (RT 547.)

She testified there were other inappropriate touchings in the apartment before she turned 14, but she could not describe them in detail.

---

[3] At the preliminary hearing in May 2003, Allena had testified this first incident in the living room was the only one she recalled in any specific detail.  (RT 570-571, 630-632; see also Joint Exhibit No. I [videotaped CALICO statement].)    At trial, she acknowledged she had not given specific descriptions of any other incidents while she was 13 until her actual trial testimony.  (RT 570-571, 630-632, 653-654.)

(RT 548.) She estimated appellant rubbed and sucked her chest four to five times a month before she turned 14. (RT 549.) She estimated he touched her vaginal area maybe once or twice a month before she turned 14. (RT 549.)

She turned 14 on July 18, 2001, while they were still living in the apartment. (RT 549.) On one occasion after she turned 14, he engaged in similar behavior when she was asleep on the couch; this time, he also licked her vagina. (RT 549-553 [Count II].)

On another occasion after they moved to the house, before Christmas of 2001, appellant came into her bedroom while she was sleeping, pulled down her pants, and licked her vagina. (RT 553-555 [Count III].) She testified there were other inappropriate touchings after she turned 14, but again could not describe them in detail. (RT 556.)

She testified she did not tell anyone because she feared her parents might hurt each other; her mom might hurt or kill appellant or vice-versa. (RT 556-557.) She also feared appellant might hurt her because she had heard he was abusive. (RT 556-558.)

## C.    Ashlee (Count IV -- The Hickey).

Age 11 at the time of trial, Ashlee always sat on appellant's lap and gave him a hug and a kiss before going to bed. (RT 376, 384-385, 398.)

A few weeks after her birthday on October 14th, 2002, she sat on appellant's lap in the living room before going to bed. (RT 376, 385-386.) She gave him a hug and a kiss. (RT 387-388.) Then he sucked on her neck for around 20 seconds. (RT 388.) This made her, sort of, uncomfortable, but she did not say anything; she was not offended at the time, and she continued to kiss appellant good night after this. (RT 388, 404-405.) She ended up with a hickey on her neck, which her mother saw the next morning. (RT 390, 440.) Upset, her mother ran upstairs and said something to appellant. (RT 392, 440-441.) Her mother did not call police, but she did discuss the matter with their pastor. (RT 441-442.)

## D.    Audrey (The Mother).

One night in the first apartment, Audrey woke up and discovered appellant was not in bed. (RT 432-433, 482.) She glanced in the kids' room, but did not see anything. (RT 432-433.) A few minutes later she saw appellant leaving the kids' room; appellant said he was closing the window, but she never saw him by the window. (RT 432-434.) She asked Allena if anyone touched her, but Allena said no. (RT 435.)[4]

---

[4] Audrey had a bad feeling that night; she explained her first husband had touched her younger sister in her private area. (RT 435-436, 463.) On numerous occasions, she also asked Allena if appellant or anyone else was touching her, but Allena always said no. (RT 437, 501.)

Audrey testified she contemplated reconciliation with appellant even after the accusation; she filed a restraining order against appellant in order to keep her children, but she only filed for divorce a few days before trial. (RT 453-455, 467, 478-480, 493.)

### E.     Sam (The Brother).

Although he was in the lower bunk bed, Sam did not recall seeing or hearing any inappropriate behavior on the part of appellant in the apartment bedroom he shared with Allena. (RT 681-682.)   He never recalled appellant climbing onto the top bunk. (RT 709.) He did recall one time when his mother said something to appellant after he left the bedroom. (RT 682.)

### F.     The Primary Report And Previous Reports.

Allena first reported being abused in a counseling session with Pastor Agee on February 6, 2003.  (RT 446-447, 449.)  Because she was uncomfortable talking, she wrote the accusation on a piece of paper and gave it to Agee; Agee wrote down a request for clarification, then she wrote more in response. (RT 566-567, 645; Defense Exhibit E-1.)[5]  In the

---

[5] A copy of Defense Exhibit E-1 has been transmitted to the parties on appeal pursuant to appellant's application to augment the record.

writing, she reports it had happened more than once since she was 13, up to several months ago. (Defense Exhibit E-1.) She refers to an incident when she was 13 on the living room floor, which is the only incident discussed with any specificity. (*Ibid.*) Contrary to her trial testimony, she appears to state appellant also touched her private area on this occasion. (*Ibid.*) She adds that at "one point I may have been 14 but he no longer touched me but put his mouth there." (*Ibid.*)

Agee contacted police and Allena was subsequently interviewed by police, then at the CALICO Center. (RT 567; see also Joint Exhibit No. I [CALICO videotape].)

The report to Pastor Agee came several months after the last touching reported by Allena and years after the first touching. (RT 446-447.) The counseling session was for Allena and Sam to discuss a fight the week before, between appellant and his biological daughter Kisha, in which they had seen or heard appellant beat Kisha with his fist; Kisha ended up with a broken lip and some scratches. (RT 443-448, 492, 496-497, 558-562, 565, 622-626, 641.)

A few days before the counseling session Audrey had told Allena she was going to have to make a decision whether to stay in her marriage with

6(VII)

appellant. (RT 448, 500.)[6] Earlier that week, Audrey had briefly taken

the children out of the house, after an argument with appellant over a power

bill. (RT 497-498.) Audrey had also begun homeschooling the children,

taking them out of public school, in September of 2002. (RT 465-467; see

also RT 405.)[7] Audrey did not believe the children were afraid of her, but

she admitted she had hit Allena with a belt, a switch, and her hand. (RT

485-488, 502.)

At first, Audrey did not know whether Allena made the accusation

because of the marital crossroads or because it was true. (RT 450.)

Audrey told Allena she was going to leave appellant anyway and that she

did not have to lie; Allena replied she was telling the truth. (RT 451.)

Pastor Agee called police. (RT 517.) Appellant was arrested at the

church the same day after he showed up for his own marriage counseling

appointment. (RT 451-452, 566.)

Allena testified she had previously told her brother Sam and her

friend Vienna Da'Re appellant had touched her inappropriately. (RT 561,

---

[6] Allena denied this; she claimed she only heard general complaints about the marriage months before. (RT 642-643.)

[7] By the time of trial, Sam and Allena had ended up with relatives in Sacramento; Allena moved because she wanted to go to public school and she did not like the schools in Oakland. (RT 464-465, 493, 522.) Allena frequently told her mother she disliked Oakland and Oakland schools; this was why her school performance deteriorated after she moved to Oakland. (RT 585-586.) All of her friends were in Sacramento. (RT 585.)

564.)  On one occasion, Sam had threatened to tell their mother about cuss words in her diary; in response, she told Sam appellant had been touching her, but she begged him not to tell anyone.  (RT 561-563, 592, 599.)[8]  She also testified she told her friend Vienna, who lived in Sacramento; she likewise told Vienna not to tell anyone, especially her mother.  (RT 564-565.)[9]

Sam testified Allena once told him their stepfather would sometimes go in their room at night and touch her.  (RT 683-684, 712-713.)  She asked him not to tell their mother.  (RT 687.)  But Sam read Allena's diary and, contrary to Allena's testimony, he did not see anything in it about being molested.  (RT 686, 701-702, 707.)  Sam also saw the hickey on Ashlee's neck.  (RT 689-690.)

Allena never told Ashlee or her mother she was molested.  (RT 402, 481.)

---

[8] Allena testified she had written about being molested in the diary, but she destroyed the diary.  (RT 503, 581, 593, 659-660.)  She shared her diary with Topaz (Elaine) Sanders, but she never told this to police and Topaz was not called to testify.  (RT 573, 581-582, 598, 659-669.)  Later she also made an audiotape diary, which was played for police but not recovered as evidence.  (RT 636-638, 664.)

[9] She denied telling Vienna she was not really sure if something bad happened.  (RT 651.)

6 (IX)

### G.    Other Evidence.

Allena and Sam shared a bedroom in the apartment in Oakland; they started off sharing a futon and later got bunk beds, with Allena sleeping on top. (RT 428-429, 503, 526, 603.) Sam never said anything to his mother about appellant going into their bedroom. (RT 503.) Ashlee slept next to Allena in a trundle bed at the house; Ashlee never heard appellant come into the bedroom at night. (RT 400-401, 505, 607-609.)

Allena denied disliking appellant's family, who also lived in Sacramento. (RT 588-589.) She also denied telling appellant's daughter Kisha that her biological father, Mr. McCain, had molested her. (RT 591.)

6 (X)

**Defense Case**

Appellant acknowledged his prior drug convictions leading to a prison term in 1988, as well as a fight in 1997 which led to a battery conviction for injuring his daughter Kisha; appellant was still on probation for the latter conviction at the time of his arrest. (RT 873, 882, 888, 947-950, 986-987.) Appellant also acknowledged giving Ashlee the hickey after she sat on his lap one night before going to bed. (RT 904.) After he checked her ears, Ashlee told him to smell her neck. (RT 905.) She smelled good, so he made a kissing or sucking motion on her neck; she laughed and he did it again until the mark was there. (RT 905.) He acknowledged causing the hickey was inappropriate, although he kissed and sucked on his granddaughter's neck too. (RT 984, 1008.)

Appellant often went into the kids' bedroom at the apartment to close the window, the blinds, or the closet door. (RT 928-930.) He recalled the night Audrey confronted him after he walked out of the bathroom. (RT 929-931, 995-996.) On this occasion, Audrey said she had a dream or a bad feeling Allena had been touched; she explained that her first husband had touched her younger sister. (RT 996.) He never molested Allena, or touched her inappropriately, in the bedroom, the living room, or anywhere else. (RT 936, 945, 997, 1008.)

6(XI)

A few days before Allena's report appellant recalled an argument with Audrey over a $600 power bill; after appellant threatened to put the account in her name, Audrey said he better pay the bills or else the police would be waiting for him when he got home from work. (RT 907-908, 995.) When he came home from work the next day, Audrey and the kids were gone. (RT 909.) They stayed away from home for two days. (RT 909-913.) Appellant had never heard of Allena or Samuel calling Pastor Agee to schedule their own appointments, as they did on the day of Allena's report. (RT 994.)

By stipulation a videotape of Allena's Calico Center statement was also played for the jury. (RT 1023; Joint Exhibit No. I.)[10] Contrary to her trial testimony, Allena states there was no touching of her vagina with the hand, only a touching of her inner thigh, although she is not positive about this. Contrary to her trial testimony, she is unable to recall details of further incidents when she was 13 beyond the first touching in the living room -- despite some questioning asking for further descriptions of incidents at this age. The conduct at the apartment when she was 13 consisted mainly of sucking on her breast and rubbing her inner thigh. Contrary to her trial testimony, she states the oral copulations only occurred after they

---

[10] Copies of this videotape have been transmitted to the parties on appeal pursuant to appellant's application to augment the record.

left the apartment. Consistent with her trial testimony, she states that the oral copulation only began when she was 14, adding that appellant's conduct was progressive in nature. Consistent with her trial testimony, she states there was never any penetration.

Allena's friend Vienna Da'Re recalled Allena saying something about being touched around a year before the report to Pastor Agee. (RT 780-784.) Allena only mentioned one time; she also said she was not really sure if something happened, because she was asleep. (RT 784-788, 793.) In the end, Allena said she thought appellant might have licked on her private part one time. (*Ibid.*)

Appellant's daughter Nakisha recalled that, on more than one occasion in 2002, Allena told her that her biological father had molested her several times. (RT 848-849.) They talked about this on several occasions, but Allena only mentioned Mr. McCain; she never said appellant molested her. (RT 849.) Allena also told her not to tell anyone. (RT 870.)

A few days before Allena's report, Audrey told one of appellant's relatives she had been planning to leave appellant for about six months; she added she was planning to go live with one of her friends. (RT 841-845.)

Audrey told a defense investigator that Allena never lied, and that

Allena never had a boyfriend. (RT 803.)[11]  Contrary to her trial testimony (RT 476), Audrey also told the defense investigator she hated appellant's family. (RT 804.)  Felicia Young, the mother of appellant's biological children (Rashaunda and Kisha), recalled Allena once refused to ride in a car with appellant's parents. (RT 824, 835.)

Appellant's daughter Rashaunda Franks testified the children told her they feared Audrey; she also witnessed Audrey discipline the children physically, including whipping Allena with a belt.  (RT 815-817.) Appellant's daughter Nakisha also reported the children feared their mother, who was the disciplinarian of the house. (RT 853-855, 870.)

Pastor Agee recalled appellant completed a church substance abuse program in exemplary fashion eight years earlier; appellant and Audrey married soon thereafter, and appellant ended up being a leading ordained minister in the church. (RT 717-718, RT 876.)  He recalled both Sam and Allena had called him to set up the meeting at which Allena made the accusation. (RT 719.)  Several months earlier he had counseled the family after the hickey incident involving Ashlee; appellant admitted giving Ashlee the hickey and police were never contacted. (RT 727-729, 733.)

Audrey's first husband, Allen McCain, recalled he separated from

---

[11] Allena admitted she had a boyfriend, Antoine, when she lived in Oakland. (RT 573.)

Audrey because she became pregnant by a soldier while in the military. (RT 739-743.) Allena never told him she had been molested. (RT 745.)

## ARGUMENT

I.  **APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT OF CONFRONTATION BECAUSE OF THE PRESENCE OF A SUPPORT PERSON DURING BOTH COMPLAINING WITNESS' TESTIMONY ABSENT ANY PARTICULARIZED SHOWING OF NEED FOR THIS PROCEDURE IN THIS CASE.**

Notwithstanding the absence of an objection, the use of a support person during both complaining witness' testimony violated appellant's Sixth Amendment right to confrontation, as well as his right to a fair trial, because no constitutionally required inquiry on the necessity of a support person took place.  (U.S. Const, amends. V, VI, XIV.)[2]

Under Penal Code section 868.5, the prosecuting witness in a child molestation case is entitled to the attendance of up to two support persons, one of whom may accompany the witness to the witness stand.  The constitutionality of this statute was considered in *People* v. *Adams* (1993) 19 Cal.App.4th 412.  In that case, the court found that permitting another

---

[2] The claim is also based on long-extant federal Confrontation Clause precedent, not the High Court's recent pronouncements regarding testimonial statements in *Crawford* v. *Washington* (2004) ___ U.S. ___ [124 S.Ct. 1354; 2004 U.S. LEXIS 1838].  California's blanket use of the support person procedure is one more example of a state law which is inconsistent with established federal precedent in this area.  (See, e.g., (Pen. Code, § 1370, subd. (b)(3) [permitting consideration of evidence extrinsic to the statement to infer special reliability, contrary to established United States Supreme Court Confrontation Clause precedent].)

person to join a witness on the stand implicates a criminal defendant's Sixth Amendment right to confrontation because it affects jury observation of demeanor evidence. (*Id.* at p. 441.) As noted in *Adams*, "[d]emeanor evidence is of considerable legal consequence." (*Id.* at p. 438.) *Adams*, nevertheless, found that section 868.5 passed constitutional muster because the state had a compelling interest in protecting child witnesses, and because the presence of a second witness on the stand, in the abstract, was an acceptable method of accomplishing this goal. (*Id.* at pp. 441-443.)

The *Adams* court, however, further held that to comport with the constitution, section 868.5 must be read to require a case-specific finding of need for a support person through an evidentiary hearing. (*Id.* at pp. 443-444.) Two United States Supreme Court cases provide the basis for this requirement: *Maryland* v. *Craig* (1990) 497 U.S. 836, 855-856, which required an evidentiary hearing to determine whether a child witness could testify outside the defendant's physical presence by means of a closed circuit television; and *Coy* v. *Iowa* (1988) 487 U.S. 1012, 1021, which required a finding of necessity to justify child testimony from behind a screen. (*People* v. *Adams*, *supra*, 19 Cal.App.4th at p. 443.) Because there had been no such hearing or finding in *Adams*, the court found federal constitutional error. (*People* v. *Adams*, *supra*, 19 Cal.App.4th at p. 444.)

In the present case, likewise, there was also no hearing or showing

of necessity that the complainants wanted or needed a support person with them at the witness stand. No cautionary instruction whatsoever was given to blunt the damaging inferences raised by this procedure, which was only applied to the complainants among all the witnesses, including other minors. Under the principles set forth in *Adams*, *Craig*, and *Coy*, the failure to conduct any inquiry whatsoever into the necessity for this procedure constituted a violation of appellant's confrontation clause rights under the Sixth Amendment. (*Ibid.*)

Because the error here is of federal constitutional dimension, this case must be reversed unless it can be shown that it was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24; *People* v. *Adams*, *supra*, 19 Cal.App.4th at p. 444.) Under this standard, the error in this stark credibility case cannot be considered harmless. Even under the standard of prejudice governing errors of state-law, reversal is required because there is a reasonable probability of a result more favorable to appellant absent this serious error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836.)

Contrary to the conclusion of the Court of Appeal (Slip Opn., pp. 6-7), the absence of defense objection does not constitute a waiver of this issue. One panel of this Court has so held. (See *People* v. *Lord* (1994) 30 Cal.App.4th 1718, 1722 [failure to object to presence of support person

waived by counsel's failure to object].)  Appellant respectfully disagrees and urges this Court to reject that holding or to deem it inapplicable here.

First, the controlling language of *Craig*, as quoted in *Adams* and set forth, above, indicates it is the *court's* sua sponte duty to ensure that the requisite necessity exists in a given case before the procedure is used. Further, counsel's failure to object should be excused here because the law concerning whether a case-specific showing of necessity is required for this statutory procedure remains unsettled.  (See *People* v. *Lord*, *supra*, 30 Cal.App.4th at pp. 1720-1722 [stating that *Adams* court's conclusion such a showing is required is debatable]; *People* v. *Haston* (1968) 69 Cal.2d 233, 256, fn. 28.)  Counsel's failure to object should also be excused here on grounds of futility and lack of a fair opportunity to object. (See, e.g., *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 823; *People* v. *Brooks* (1979) 88 Cal.App.3d 180, 186; see also *People* v. *Briggs* (1962) 58 Cal.2d 385, 410; *People* v. *Kitt* (1978) 83 Cal.App.3d 834, 848.)  Although a support person appeared at the preliminary hearing, the entire trial procedure here was quite abrupt indeed.  Counsel should not be expected to alienate the jury by objecting to the abrupt procedure followed here at the last minute in front of the jury.  At a minimum, there is no consistently applied state procedural bar under the circumstances.  Reversal and remand to afford appellant a fair trial is required.

**II.    THE COURT ERRED IN ADMITTING OFFICER SOUZA'S TESTIMONY REGARDING REPORTING DYNAMICS AMONG CHILD WITNESSES ABSENT SUFFICIENT SHOWING OF HIS EXPERT QUALIFICATIONS IN THIS AREA, DENYING APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL.**

Among several other points like Allena's earlier equivocation to her friend, defense counsel stressed her growing new accounts at trial in arguing her credibility to the jury.    (RT 1057-1058.)    Against this background, defense counsel at trial unsuccessfully attempted to preclude officer Souza from testifying regarding child reporting dynamics which was addressed to critical delays and growth in detail in Allena's accounts. (RT 764-766.)   No limiting instruction of any kind was given.

The court's ruling admitting this testimony without sufficient foundational inquiry establishing officer Souza's qualifications as an expert in the area of opinion was error.   The error further deprived appellant of due process of law and a fair trial.   This is because admission of unreliable, or at least unfounded, expert testimony, without limiting instruction, explaining the conspicuous reporting delays in this case had great impact on the jury's credibility determinations, resulting in fundamental unfairness and denial of a fair trial in a close credibility case.   (U.S. Const., amends. V, XIV; Cal. Const., art. I, §§ 7, 15.)

Evidence Code section 720, subdivision (a) provides in part that:

*"Against the objection of a party, [a witness's] ... special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert."* (Emph. added.)  Although a trial court is given considerable latitude in determining the qualifications of an expert, that discretion "is not absolute." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 373.)  Further, an expert's qualifications "must be related to the particular subject upon which he is giving expert testimony.  Qualifications on related subject matter are insufficient." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 852; *People* v. *Chavez* (1985) 39 Cal.3d 823, 828-829.)

Officer Souza's brief description of his investigative experience was simply too sparse and uncertain to constitute a foundation to explain child sexual abuse reporting delays and dynamics (notably, increasing details over time).  (RT 764.)  The examination offered here was too vague to establish meaningful qualification in this particular subject, as opposed to the related subject of police interviews of children generally.  (*People* v. *Hogan*, *supra*, 31 Cal.3d at p. 852; *McCleery* v. *Bakersfield* (1985) 170 Cal.App.3d 1059, 1072.)  The CALICO Center used in this case to provide for child interviews by dedicated child professionals, not police officers, is further indication raw interview experience does not necessarily equate to experience in childhood trauma.

Contrary to the conclusion of the Court of Appeal (Slip Opn., p. 8),

these opinions were also clearly expert in nature. (Evid. Code, § 801, subd. (a) [defining proper subjects of expert testimony].) Souza's categorical-sounding testimony was closely akin to testimony on facets of Rape Trauma Syndrome (RTS) or Child Sexual Abuse Accommodation Syndrome (CSAAS), except that no limiting instruction was given on the matter here, permitting jurors to consider the testimony to resolve gaping credibility questions raised by Allena's changing accounts. (See CALJIC No. 10.64.)[3]

Defense counsel asserted a relevance objection when the prosecutor broached the topic, then attempted to argue the basis for foundation after the court broached foundation, a point not mentioned in the Court of Appeal's opinion. Moreover, the bell was rung for jurors when officer Souza began expansively answering the first few foundational questions under guise of police interview techniques. Further objection should again be excused on grounds of futility and lack of a fair opportunity to object. (See, e.g., *People v. Remiro*, *supra*, 89 Cal.App.3d at p. 823; *People v. Brooks*, *supra*, 88 Cal.App.3d at p. 186; see also *People v. Briggs*, *supra*, 58 Cal.2d at p. 410; *People v. Kitt*, *supra*, 83 Cal.App.3d at p. 848.) At

---

[3] The general, categorical sounding nature of this testimony also differs from typical lay opinion testimony, which is supposed to be stated in the least possible level of generality or abstraction possible. (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.)

a minimum, there is no consistently applied state procedural bar here where the answers were sprung on defense counsel in this fashion. Further, the reviewing courts retain discretion whether to apply waiver or forfeiture in a given case. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

Contrary to the conclusion of the Court of Appeal (Slip Opn., p. 8), if somehow defense counsel were required to press further objection to preserve the claim, counsel's failure to do so deprived appellant of the effective assistance of counsel without conceivable tactical justification, warranting relief on direct appeal. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215-218; *People v. Stratton* (1988) 205 Cal.App.3d 87, 90.) Appellant raises this contention under both the California and United States constitutions. (See *In re Fields* (1990) 51 Cal.3d 1063, 1069-1070; *Strickland* v. *Washington* (1984) 466 U.S. 668, 689; U.S. Const., amends. VI, XIV.) Further, resolution of the claim on direct appeal is peculiarly appropriate here. Counsel plainly desired to exclude this testimony and attempted to do so, at least up until the bell had already been rung with officer Souza's first expansive answer. There was no tactical reason for not asserting further objection to this critical testimony if this were required.

In a stark credibility case like this one, this serious error requires reversal under any standard. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra,* 46 Cal.2d at p. 836.)

**III.    THE COURT ERRED PREJUDICIALLY IN DEFINING THE OFFENSE OF RESIDENTIAL CHILD MOLESTATION UNDER PENAL CODE SECTION 288.5 AS A GENERAL INTENT CRIME, DENYING APPELLANT DUE PROCESS OF LAW, A FAIR TRIAL, AND HIS RIGHT TO A JURY DETERMINATION ON ALL ISSUES.**

Defining the section 288.5 offense on which appellant was tried as a general intent crime, and failing to instruct the jury on how to resolve competing inferences regarding whether lewd intent was shown, were serious errors. By reducing the burden of proof and obviating the need for essential jury findings, the errors further deprived appellant of due process of law, a fair trial, and his right to a jury determination on all issues beyond a reasonable doubt. (Cal. Const., art. I, §§ 7, 15, 16; U.S. Const., amends. V, VI, XIV; *In re Winship* (1970) 397 U.S. 358, 364; *Keating* v. *Hood* (9th Cir. 1999) 191 F.3d 1053, 1062.)

As the Court of Appeal recognizes (Slip Opn., p. 9), where the charge is in fact based on lewd acts and argued as such, the section 288.5 charge is every bit as much a specific intent crime as the lewd acts upon which it is based. (Pen. Code, §§ 288, 288.5; CALJIC Nos. 10.42, 10.42.6.) As given here, the general and specific intent instructions clearly informed the jury this was merely a general intent crime like the lesser battery offense and unlike the remaining charges. Affirmatively instructing the jury this was a general intent crime when it was not was clear error.

(*People* v. *Zerillo* (1950) 36 Cal.2d 222, 231-232; *People* v. *Holquin* (1964) 229 Cal.App.3d 398, 403; *People* v. *Germany* (1974) 42 Cal.App.3d 414, 418-419; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 585-587.) Further, the court erred in omitting this offense from the special version of CALJIC No. 2.02 given here which defined the jury's duties in resolving conflicting reasonable interpretations regarding the defendant's specific intent, an important point for jurors. (*Ibid.*; see also *People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49; *People* v. *Bender* (1945) 27 Cal.2d 164, 175.) The court likewise erred in failing to include this offense within the ambit of CALJIC No. 3.31, which defines specific intent offenses as well as the requirement of concurrence between act and specific intent. (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 220; *People* v. *Ford* (1964) 60 Cal.2d 772, 792-793; *People* v. *Turner* (1971) 22 Cal.App.3d 174, 184.) Even though the prosecutor argued the correct intentional lewd act definition contained in the section 288.5 instruction (CT 145), the instructions given here remain unnecessarily conflicting and incomplete on important points.

Contrary to the conclusion of the Court of Appeal (Slip Opn., pp. 9-10), in the face of these general verdicts and enhancement findings, reversal per se is required because it cannot be determined whether the verdict rested on the unconstitutional theory on which the jury received instruction.

(*Francis* v. *Franklin* (1985) 471 U.S. 307, 322; *Milanovich* v. *United States* (1961) 365 U.S. 551, 554-555 [reversal of theft and receiving stolen property convictions required]; *Francis* v. *Franklin, supra*, 471 U.S. at p. 322; *People* v. *Guiton* (1993) 4 Cal.4th 1116, 1131; see also *Ho* v. *Carey* (9th Cir. 2003) 332 F.3d 587, 592-596 [where general verdicts did not disclose grounds of conviction, conflicting general versus specific intent instructions on intent required for implied malice murder required reversal on collateral federal review].)  At a minimum, the court's errors require reversal under application of the *Chapman* standard of prejudice.  Even under the standard of prejudice announced in *People* v. *Watson, supra*, 46 Cal.2d at p. 836, reversal of this conviction is required, because it is reasonably probable that a result more favorable to appellant would have been reached absent these serious errors.

IV.  **THE TRIAL COURT ERRED PREJUDICIALLY IN FAILING TO GIVE CALJIC NO 17.10 REGARDING THE LESSER BATTERY OFFENSE, DENYING APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL.**

As noted, the court instructed on battery (Pen. Code, § 242) as a lesser offense to all the charges.  (CT 142, 146, 148-149; RT 1100, 1107-1108, 1111.)  However, the instructions given merely defined battery and specified it was a lesser offense for purposes of the verdict forms.  (*Ibid.*)  The court did not give CALJIC No. 17.10 or any instruction like it addressing how the jury should evaluate lesser offenses.  This was error.  By reducing and confusing the burden of proof and obviating the need for essential jury findings, the error further deprived appellant of due process of law, a fair trial, and his right to a jury determination on all issues beyond a reasonable doubt.  (Cal. Const., art. I, §§ 7, 15, 16; U.S. Const., amends. V, VI, XIV; *In re Winship*, *supra*, 397 U.S. at p. 364; *Keating* v. *Hood*, supra, 191 F.3d at p. 1062.)

"[W]hen the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury *must be instructed* that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense."  (*People* v. *Dewberry* (1959) 51 Cal.2d 548, 555 [emph. added]; *People* v. *Gonzalez* (1983) 141 Cal.App.3d 786, 793.)  Part of the purpose

6 (12)

of CALJIC No. 17.10 is to expressly advise the jury "that it must choose the lesser offense if it entertains any reasonable doubt as to the greater." (*People* v. *Gonzalez*, *supra*, 141 Cal.App.3d at p. 794.)   Of course, CALJIC No. 17.10 also serves the more basic purpose of informing the jury which offenses are lesser includeds and what this means for the jury's deliberations and findings.

An instruction like CALJIC No. 17.10 that informs jurors which offenses are "lesser" and what this means is also required sua sponte. (See also *Mandatory Criminal Jury Instructions* (C.J.E.R. 1997), § 2.125, p. 90 [listing CALJIC No. 17.10 among mandatory or sua sponte instructions].) Further, courts must instruct sua sponte on all principles of law which are "closely and openly connected with the evidence [and] which are necessary for the jury's proper consideration of the case." (*People* v. *Owen* (1991) 226 Cal.App.3d 996, 1004 [cit. om.].)   An instruction like CALJIC No. 17.10 can only be considered part and parcel of the courts' sua sponte instructional duties regarding lesser offenses. (See also *People* v. *Brew* (1991) 2 Cal.App.4th 99, 106 [insufficient to merely instruct on the elements of lesser included offenses without presenting those offenses as options or alternatives to the greater offense].)

Here, not only did the court fail to give CALJIC No. 17.10, the court did not even instruct the jury it must resolve any reasonable doubts

in favor of the lesser offense. In contrast, as noted, jurors were told to resolve any reasonable doubts as to specific intent in appellant's favor, although Count I was omitted from this instruction. As in *Dewberry*, the instructions left jurors with a skewed impression; here the impression was that the reasonable doubt presumption did not apply to the issue of the lesser offense or general intent as regards Count I, only to specific intent under the other counts.

The error is also prejudicial under either *Chapman* or *Watson*. The court instructed upon the battery offense for a reason: the evidence supported it. The jury needed the guidance supplied by CALJIC No. 17.10 as to how to evaluate the greater and lesser offenses. The jury also needed to know it should find the lesser offense if it had a reasonable doubt as to whether the greater offense was proved. Even under the state-law prejudice standard, "'there exists such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result,' and accordingly the error is prejudicial." (*People* v. *Dewberry*, *supra*, 51 Cal.2d at p. 557 [quoting *People* v. *Watson*, *supra*, 46 Cal.2d at p. 837].) Reversal of the judgment is required. At a minimum, the error requires reversal of the conviction under Count I.

V.    **THE COURT ERRED IN INSTRUCTING THE JURY WITH CALJIC NO. 2.21.2, BECAUSE THE INSTRUCTION PERMITTED EVALUATION OF THE PIVOTAL PROSECUTION TESTIMONY BY A PROBABILITY STANDARD, DENYING APPELLANT DUE PROCESS OF LAW.**

The court instructed the jury with CALJIC No. 2.21.2 which provides in pertinent part that: "You may reject the whole testimony of a witness who willfully has testified falsely to a material point unless, from all the evidence, you believe the *probability* of truth favors his testimony in other particulars." (CT 141; RT 1098 [emph. added].)

Recognizing that this Court has now approved the instruction in several contexts (*People v. Nakahara* (2003) 30 Cal.4th 705, 714; *People v. Hillhouse* (2002) 27 Cal.4th 469, 493; *People v. Beardslee* (1991) 53 Cal.3d 68, 94-95), appellant nonetheless submits that the unnecessary probability reference in this instruction constitutes federal constitutional error.  As applied here, the instruction permitted jurors to resolve dispositive credibility questions as to impeached prosecution witnesses by a preponderance standard. (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1046.)  Dispositive credibility questions must be resolved beyond a reasonable doubt, not under a probability standard more suited to foundational evidentiary issues as set forth in the current CALJIC No. 2.21.2. CALJIC No. 2.21.2 permits jurors to apply a probability standard

to the dispositive testimony in a case. (See *People* v. *Rivers*, *supra*, 20 Cal.App.4th at pp. 1045-1046; 2 McCormick, *Evidence* (4th ed. 1992), ch. 36, p. 437-439 & fn. 13 [term "probability" implies a standard of preponderance of the evidence].) This probability standard is plainly erroneous, especially when it is applied to dispositive prosecution testimony, as jurors almost certainly did here as to Allena and her mother, in a stark credibility case. (RT 1042-1045, 1058, 1076.)

Appellant submits the error violated due process in this case, because the error operated to lessen the prosecution's burden of proof below the reasonable doubt standard with respect to pivotal prosecution testimony. (*In re Winship*, *supra*, 397 U.S. at pp. 358, 364; Cal. Const., art. I, §§ 7, 15; U.S. Const., amends. V, XIV.) Thus, the standard of prejudice governing errors of constitutional dimension should apply. (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1312-1316.) Moreover, when conflicting instructions are given (here, regarding ultimate burdens of proof) a reviewing court cannot assume the jury followed the correct ones. (*Francis* v. *Franklin*, *supra*, 471 U.S. at p. 322; *United States* v. *Stein* (9th Cir. 1994) 37 F.3d 1407, 1410; *United States* v. *Varner* (4th Cir. 1984) 748 F.2d 925, 926-927; *United States* v. *Gray* (5th Cir. 1980) 626 F.2d 494, 500.) The error cannot be considered harmless in a credibility case like this one.

**VI.    THE CUMULATIVE EFFECT OF THE ERRORS DISCUSSED ABOVE DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND A FAIR TRIAL AND REQUIRES REVERSAL OF THE JUDGMENT OR, AT A MINIMUM, APPELLANT'S CONVICTION UNDER COUNT I.**

The courts of this state recognize their obligation to assess the cumulative effect of errors on a criminal conviction. (See, e.g., *People v. Ryner* (1985) 164 Cal.App.3d 1075, 1087; *People v. Williams* (1971) 22 Cal.App.3d 34, 40, 58.)  Moreover, the cumulative effect of errors may operate to deprive a defendant of due process and a fair trial, requiring reversal irrespective of any lack of objections on the part of defendant. (See *Taylor v. Kentucky* (1978) 436 U.S. 478, 486-490 [98 S.Ct. 1930]; *Darden v. McNeel* (5th Cir. 1992) 978 F.2d 1453, 1456; *People v. Mills* (1978) 81 Cal.App.3d 171, 176.)  In the present case, the cumulative effect of the errors discussed above deprived appellant of a fair trial, requiring reversal of the judgment or, at a minimum, appellant's conviction under Count I.

## VII. THE UPPER DETERMINATE TERM WAS IMPOSED IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT GUARANTEES OF TRIAL BY JURY, AS RECENTLY INTERPRETED BY THE SUPREME COURT IN *BLAKELY V. WASHINGTON*.

The questions of what effect *Blakely* and *Booker* have on the imposition of California upper terms and consecutive terms, including standards of review and prejudice (and most likely the question of forfeiture), are currently pending before the California Supreme Court. (*People* v. *Towne*, rev. grt. July 14, 2004 (No. S125667); *People* v. *Black*, rev. grt. July 28, 2004 (No. S126182).) Contrary to the conclusion of the Court of Appeal (Slip Opn., pp. 13-15), the upper term imposed on appellant cannot stand consistent with *Blakely* v. *Washington* (2004) ___ U.S. ___ [124 S.Ct. 2531; 159 L.Ed.2d 403] or *United States* v. *Booker* (2005) ___ U.S. ___ [2005 C.D.O.S. 315].

This Court is well aware of the rule applied in the foregoing cases and the related issues pending before it. Contrary to the conclusion of the Court of Appeal (Slip Opn., pp. 13-15), the error here cannot be considered harmless beyond a reasonable doubt under any conceivable prejudice analysis. Fully three of the four aggravating factors here were based upon facts beyond the prior prison term admissions. (CT 173-176.) Further, in finding appellant's convictions numerous, the court presumably considered

several convictions beyond those which appellant admitted. (Prob. Rep., pp. 3-4.)

The Court of Appeal here also errs in extending the current precarious exception under the law for the "fact" of prior convictions to matters like prison terms, probation grants, and characterizations of the seriousness of the offenses based on underlying facts. Certainly, there was no knowing jury trial waiver of appellant's *Blakely* rights for purposes of imposition of an upper term. In any event, it cannot be assumed that the remote and/or less serious prior convictions which appellant admitted were dispositive for the court as against the other aggravating factors cited. This is especially so given the age of the more serious Sacramento drug convictions (which led to the two prison terms in the 1980s), and appellant's attempts to straighten out his life since that time. (Prob. Rep., pp. 3-4.)

The court as much as stated it was swayed by facts going beyond the bare jury verdicts here. In short, the four-year increase in the term imposed on appellant by is every bit as invalid as the court finding of deliberate cruelty based on offense-specific facts in *Blakely*. Remand for resentencing is required, particularly where it cannot be determined on this record whether any single factor, such as the bare fact of a remote prior conviction, was determinative for the court.

VIII. <u>Habeas Corpus Is A Proper Vehicle For The Presentation Of Petitioner's Claim</u>

The claims asserted in this Petition are that the Petitioner was deprived of his constitutional right to the effective assistance of counsel, both trial counsel and appellate counsel. Although habeas Corpus cannot serve as a second appeal, denial of the right to counsel is a claim cognizable on habeas corpus whether or not it was raised on appeal. (<u>In re Hochberg</u>, (1970) 2 Cal. 3d 870, 875.)

IX. <u>Appellate Counsel Was Ineffective In That He Failed To Raise A Viable Issue On Direct Appeal</u>

In the instant matter, Petitioner was Prosecuted, Prior to being Convicted, for allegedly sexually abused his two minor stepdaughters: Allena and Ashlee.

The record shows that the bulk of damaging testimonial evidence was elicited from Allena, who testified to continuous abuse over several months. Whereas, the incident which involved Ashlee was limited to one occurrence where Petitioner sucked

1  Ashlee's neck, and she ended up with a hickey. (See, infra,
2  Statement of the Facts," at PP. 3(10) through 3(18).)

3

4      The record, also, shows that, to a large degree, Petitioner's
5  guilt pivoted upon Allena's credibility. Thus, trial counsel devoted
6  a great deal of effort towards undermining Allena's credibility.

7

8      At the onset of the trial, for instance, trial counsel enunciated
9  a myriad of inconsistent, or contradictory, statements made by
10  Allena. (Eg., see Exhibit A, "Broome's Opening Statement," attached
11  hereto.) And, in his closing argument, Broome highlighted Allena's
12  untruths with more specificity, and he proffered Allena's motive for
13  wanting "to point the finger at Mr. Franks [Petitioner] and to
14  get him into all kinds of trouble." (See Exhibit B, "Broome's
15  Closing Argument," at PP. 1055, lns. 1-12; 1057, lns. 26-28; 1058 lns 1-2,
16  24-28; 1059, lns 1 9-15; 1067, lns. 16-28; 1068, lns. 1-6, 27-28; 1069, ln.
17  1; 1072, lns 6-8; 1073, lns. 1-12; 1076, lns 21-23; 1077, lns. 15-21.)

18

19      With this in mind, most relevant to the forthcoming claim
20  of error, was trial counsel's closing, hypothetical questions for which
21  he posed to the jurors: "It was raised as to what motive would
22  this young 13-year-old child have? and "What possible motive
23  could she have for wanting to tell this story and to point the finger
24  at Mr. Franks and to get him into all kinds of trouble? (See Exhibit
25  B at P. 1055 lns. 1-5.)

26

27      Without doubt, after all the trial counsel's showings, to the

1  Jurors, that there exist, on Allena's Part, inconsistent and contradictory
2  statements, the Jurors, still, would have been confused as to why
3  would she want to lie on Petitioner? Why would she want to Point
4  her finger at Petitioner and to set him in all kinds of trouble?

6  Petitioner submits that trial counsel, being aware that the
7  element of Allena's motive (or her ability to sustain such an elaborate
8  lie) was missing from the defense Presentation, should have enlisted
9  the services of expert witness, who could Performed Psychiatric
10  examination of Allena, to ascertain her ability, and Possible motive, to
11  falsely implicate Petitioner and to offer expert testimony in support of
12  the defense.

14  Petitioner further submits that trial counsel's failure to obtain
15  competent Psychiatric assistance in the Preparation of a defense,
16  though not necessarily decisive, certainly merited careful Presentation
17  by appellant counsel, on direct appeal, and in a Petition for writ of habeas
18  Corpus — especially, since he raised a claim of ineffective assistance
19  of counsel regarding trial counsel's failure to challenge Officer
20  Souza's qualifications as an expert or to object that a Proper foundation
21  had not been established for the officer's testimony to be admitted [1]/

23  [1]/ Officer Souza was called as a defense witness. On direct examination,
24  trial counsel asked Officer Souza questions about his investigation of this
25  case, the CALICO Center, and Allena's specific interview at the CALICO
26  Center. (Reporter Transcripts [hereafter, RT] 157-164.) Officer Souza
27  had been employed with the special victims unit for six months and,

1    Moreover, in that Appellate Attorney Shipp argued, in Petitioner's

2 opening brief, Officer Souza had only been in the special victims unit

3 for six months (RT 764), that he received no training in child sexual

4 abuse cases until he entered the unit and the nature of the training

5 was not described, that he investigated a variety of crimes including

6 adult sexual assaults, child sexual assaults, and child abuse,

7 that he had investigated "200 cases involving [child] sexual assault

8 and child abuse," and that this scant foundation was

9 insufficient to qualify Souza as an expert in the typical length

10 of child reporting delays or child reporting dynamics in sexual

11 assault cases (See Exhibit C, " Excerpt of Appellant's Opening

12 Brief," pp. 27-33) he had to had perceived that trial counsel

13 erred in calling Officer Souza and not call an Psychiatrist, whose

14 expertise was child sexual assaults and who could supply

15 testimony regarding the typical length of child reporting delays

16 or child reporting dynamics in sexual assault cases, but, moreover,

17 who could have performed a psychiatric examination of Alleena,

18 to ascertain her ability, and possible motive, to falsely implicate

19

20 therefore, was not an expert on child sexual assault victims. (RT 30-

21 31.) The Prosecution, on cross-examination, however, elicited testimony

22 from Officer Souza that was beyond the scope of his expertise, viz.,

23 children of sex crimes tend to remember more as time goes on. (RT

24 764-766.) Thus, Appellate Counsel Shipp raised a claim of ineffective

25 assistance of trial counsel regarding trial counsel's failure to challenge

26 Officer Souza's qualifications as an expert or to object that a proper

27 foundation had not been established for the officer's testimony to be admitted.

COURT PAPER
COPY
STATE OF CALIFORNIA
STD. 113A (REV. 8-72)

1  Petitioner.

2

3    Petitioner submits that Appellate Attorney Shipp did not render
4  Petitioner the thoughtful assistance to which Petitioner was
5  entitled. Clearly, trial counsel's failure to enlist the services
6  of an expert witness for the purpose of interviewing, investigating,
7  and performing psychiatric examination of Allena and ascertaining
8  her ability, and possible motive, to falsely implicate Petitioner
9  was crucial to the defense, and the lack thereof deprived the
10  jurors of information to which they were entitled to.

11

12    Therefore, the inexcusable failure of Appellate counsel
13  Shipp to raise the hereinabove-mentioned omission of trial
14  counsel, which arguably might have resulted in a reversal,
15  deprived Petitioner of the effective assistance of appellate
16  counsel to which he was entitled under the Constitution.

17

18  ## X. Trial Counsel's Performance Was Deficient

19

20    As stated above, the jury's determination of Petitioner's
21  guilt, to a large degree, pivoted on the weight it gave to Allena's
22  credibility. Therefore, the sole defense was the discrediting
23  of Allena's testimony. Yet, the defense simply could not end at
24  making Allena's testimony unbelievable; it had to incorporate a
25  reasonable explanation, offered to the jury, as to _why and how_
26  Allena could, or would, devise such a story against Petitioner.
27  And that bit of information needed to come from other than Petitioner's

COURT PAPER
COPY
STATE OF CALIFORNIA
STD. 113A (REV. 8-72)

1  trial counsel. Indeed, the information for which the jury required
2  needed to come from one who could testify from the depth
3  scope of specialized knowledge; the information needed to come
4  from an expert.

5

6      Without doubt, the assistance of a Psychiatrist was
7  crucial to Petitioner's ability to marshal a viable defense.
8  The Psychiatrist would have gathered facts, through Professional
9  examination, interviews, and elsewhere, that he or she would
10 have shared with the jury; he or she would have analyzed
11 the information gathered and from it drew plausible conclusions
12 about Allena's ability, and possible motive, to falsely implicate Petitioner.

13

14     Moreover, unlike lay witnesses who can merely describe a
15 condition, or phenomenon, they believe might be relevant to the issue
16 at hand, a Psychiatrist could have identified the "elusive and
17 often deceptive" constitutes relevant to the issue at hand, and
18 tell the jury why his or her observations were relevant. Further,
19 where Permitted by evidentiary rules, a Psychiatrist could have
20 translated any Medical diagnosis into language that would have
21 assisted the trier of fact and therefore offered evidence in a
22 form that had meaning for the task at hand. Through that
23 process of investigation, interpretation, and testimony, a Psychiatrist
24 ideally could have assisted the lay jurors, who had no training,
25 generally, in Psychiatric matters, to have made a sensible and
26 educated determination about Allena's ability, and possible
27 motive, to falsely implicate Petitioner.

Petitioner submits, when Jurors make determinations about issues that inevitably are Complex and foreign, the testimony of a Psychiatrist can be crucial and a virtual necessity if a defense to undermine the credibility of a minor in a sexual abuse case is to have any chance of success.

In addition, "[T]estimony emanating from the depth and scope of specialized Knowledge is very impressive to a Jury. The same testimony from another source can have less effect." (F. Bailey and H. Rothblatt, Investigation and Preparation of Criminal Cases, Section 175 (1970); Although not adopted by California, see also, ABA Standards for Criminal Justice 5-1.4, Commentary, P. 5-20 (2d ed. 1980) ["The quality of representation at trial ... may be excellent and yet valueless to the defendant if the defense requires the assistance of a Psychiatrist ... and no such services are available].")

In the instant matter, trial counsel repeatedly revealed inconsistent and/or contradictory statements made by Allena. For example:

1. Allena, in her Pretrial Calico Center statement, stated, there was no touching of her vagina with the hand, only a touching of her inner thigh although she was not positive about this. [2]

_____

[2] Calico Center Statement entered as Joint Exhibit No. 1, Case No. C145147

Whereas Allena, at trial, testified that Petitioner propped her leg up and pull down her pants and underwear (RT 543, 546) and rubbed her vagina with his hand (RT 546-547.)

2. Allena, in her Pretrial Calico Center statement, stated, She was unable to recall details of further incidents when she was 13 beyond the first touching in the living room — despite some questioning asking for further descriptions of incidents

Whereas Allena, at trial, acknowledged she had not given specific description of any other incident while she was 13, until her actual trial testimony. (RT 570-571, 630-632, 653-654.)

3. Allena, in her Pretrial Calico Center statement, stated Petitioner had orally copulated her, and it occurred only after they moved from the apartment to a house on 66th Avenue in Oakland.

Whereas Allena, at trial, testified that while she was asleep on the couch [at the apartment] Petitioner pulled down her pants and orally copulated her. (RT 550-551.) She testified to the same occurrence after they had moved from the apartment. (554-555.)

//

COURT PAPER
COPY
STATE OF CALIFORNIA
STD. 113A (REV. 8-72)

Accordingly, it must be safe to say that, at some point at trial, the jurors habored uncertainties about Allena's credibility. Yet, the jurors uncertainties, no doubt, were overshadowed by their inabilities to perceive "Why" — why would this young 13-year-old child invent such an elaborate story? The jurors lacked the information wherewith they could have conceived Allena's motive or ability to falsely implicate Petitioner.

And, it is exactly this type of information that an expert witness could have conveyed to the jury.

It was trial counsel's duty to investigate carefully all defenses of fact and of law that might have been available to Petitioner (See In re Williams, supra, 1 Cal. 3d at P. 175, 81 Cal. Rptr. 784), and to obtain such Psychiatric and Medical evidence as might be relevant to the case (Citation.) As Petitioner has shown, hereinabove, such evidence might have been crucial to Petitioner's case.

Trial counsel's deficient Performance fell below an objective standard of reasonableness, because his omission deprived the jury of the opportunity, fairly and fully, to assess the accuracy of testimony damaging to Petitioner or to determine the honesty of the witness who gave that testimony.

The requirement that Petitioner must establish that trial counsel's error and omissions Prejudiced the defense "does not mean that relief is available only if the Petitioner would have

COURT PAPER
COPY
STATE OF CALIFORNIA
STD. 113A (REV. 8-72)

1 | been acquitted but for counsel's blunders." (Cooper v. Fitzharris,
2 | 586 F.2d 1325, 1333 (9th Cir. 1978)(en banc), cert. denied, 440 U.S.
3 | 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979).) Recognizing that "[t]he
4 | guilty as well as the innocent are entitled to a fair trial," the
5 | primary inquiry is whether counsel's incompetence impaired his
6 | defense, not whether the defendant would have been convicted
7 | in spite of those errors. (United States v. Tucker, 716 F.2d 576,
8 | 587 (9th Cir. 1983).)
9 |
10 | While the question of whether a defendant has been denied
11 | a fair trial can only be answered in the context of a particular
12 | case, it is clear that a defendant is denied a fair trial where
13 | the actions of his attorney "precluded the fact-finder from
14 | independently judging the merits of the case." (United States v.
15 | Campbell 616 F.2d 1151, 1152 (9th Cir. 1980), cert. denied, 447 U.S.
16 | 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).)
17 |
18 | Here, trial counsel's failure to utilize the services of
19 | a Psychiatrist, and the same as an expert witness, virtually
20 | assured that the jury would be denied the opportunity, fairly
21 | and fully, to judge the soundness of the prosecution's case
22 | and the merits of petitioner's defense. The jury did not
23 | have the opportunity to consider evidence which explained
24 | Allena's ability, and possible motive, to falsely implicate
25 | Petitioner.
26 | //
27 | //

COURT PAPER
COPY
STATE OF CALIFORNIA
STD. 113A (REV. 8-72)

1  Wherefore Petitioner Pray; That the Court grants the
2  habeas relief sought in this Petition for writ of habeas Corpus.
3  Dated: MARCH   10         , 2008
4
5                              Respectfully submitted,
6                              Raymond Franks Jr
7                              Raymond Franks
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:    Incorporated into argument

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?          Yes_____      No_✓___

8   If you do, give the name and address of your attorney:

9   _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _MARCH 10, 2008_          _Raymond Frankle_

14                 Date                              Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

## DECLARATION AND PROOF OF SERVICE BY MAIL

I, RAYMOND FRANKS , declare under the penalty of perjury that I am over the age of 18 years, ( ) and not a party, or (X) am a party to this action, and reside in Solano County, at P.O. Box 4000, (Cell # 234 ) Vacaville, California, 95696-4000.

That on MARCH , 10 , 2008, I deposited in the United States Mail at California State Prison - Solano, Vacaville, California a copy of the attached hereof:

Federal Petition for Writ of habeas Corpus

in a sealed envelope with postage fully prepaid, and addressed to: Office of the Attorney General
455 Golden Gate Ave
San Francisco, CA 94102

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this MARCH , 10 , 2008, at CSP-Solano, Vacaville, California, 95696-4000.

Raymond Franks

DECLARANT

RAYMOND FRANKS V08354
C.S.P SOLANO
P.R. BOX H6500
VACAVILLE, CA. 95696-4000

12.234 u





PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ™
www.usps.gov
LABEL 107R, OCT 1997

U.S. DISTRICT COURT
NORTHERN DISTRICT
450 GOLDEN GATE AVE.
San Francisco, CA. 94102

CSP SOLANO
STATE PRISON

RECEIVED
MAR 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Rose

$ 04.60⁰