# EXHIBIT COVER PAGE:

Exhibit: _____A_____

Description of this exhibit: Trial Counsel's Opening Statement

Number of pages of this exhibit: __11__ pages

CV 08        1525

SBA

(PR)

E-filing

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

__Y__ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections. 602 Exhibit.

_____ Other: _____

Exh. A

1    girls go to bed.  And the next day, as Ms. Franks is in

2    the kitchen making breakfast for the family, she looks

3    down at her little girl and sees a huge hickey on her

4    neck.  Ms. Franks will talk to you about that.  Ashlee

5    will talk to you about that.

6         There was an argument between Ms. Franks and

7    the Defendant after Ashlee spoke to her mother about the

8    incident.  And then when she went to a church function,

9    her mother put a turtleneck on her so it wouldn't be

10   noticeable, even though the weather was hot that

11   October, to church members what had happened.

12        This is a case about trust, as I told you; the

13   trust children place in a caregiver, a stepfather, to

14   care for them properly; the trust a woman places in a

15   man that she marries and chooses to bring into her home

16   to be around her children.  It's a case about a betrayal

17   of that trust.  And at the end of all of the evidence,

18   I'm confident you'll find this Defendant guilty as

19   charged.

20        Thank you.

21        THE COURT:  Thank you, Ms. Leventis.

22        Mr. Broome, do you want to give your opening

23   statement at this point or reserve it?

24        MR. BROOME:  I choose to give it now.  Thank

25   you very much.

26             OPENING STATEMENT BY MR. BROOME

27        Good morning, ladies and gentlemen.

28        THE JURY:  Morning.

Loser stock Form B

Colby USA 1-800-255-5040

1    MR. BROOME:  First, I want to thank all of you

2    for sitting through the two days of jury selection.

3    Some of you might have thought it's a bit laborious and

4    some were absolutely bored.  Thanks for sitting with us

5    and sitting on this case.

6         As I indicated, my name is Thomas Broome.

7    This is my client, Mr. Raymond Franks Jr., and his name

8    doesn't change as we go through this proceeding; still

9    it remains Raymond Franks Jr.  I quote the Defendant; he

10   has a name.

11        As Judge Dorado explained to you in his

12   preinstructions a few moments ago, this is basically not

13   argument but, rather, merely an indication of where we,

14   as lawyers, think the evidence will go and what it will

15   show in this particular case.  That's very important,

16   because all the evidence comes from the witness stand

17   and no other source.  You should be taking no notes at 

18   this point, because we lawyers are talking; it's not

19   evidence.

20        Now, what the evidence is going to show in

21   this case is some of what Ms. Leventis said, and other

22   parts, obviously, not what she said.

23        What occurred with regard to the actual

24   relationship between Audrey Franks and her first

25   husband, Samuel McCain, is they were married, and they

26   had two children, and she chose to go into the military,

27   and she went into the military.  While there, she became

28   impregnated by another soldier, and that is what led to

1    the actual dissolution of that particular marriage.

2    Needless to say, Mr. McCain was not happy.  It was a

3    very acrimonious divorce.

4        And during the course of the divorce

5    proceedings, the children were in the midst of that

6    process.  They apparently agreed that, well, Mr. McCain

7    can have the children.  And he did become the custodial

8    parent of those children for quite a few years.

9        Sometime in 2000, probably around July -- I

10   think that's the correct date or month -- the mother

11   went to Sacramento and, actually, without Mr. McCain

12   knowing, took the children.  Apparently, they had been

13   sort of left alone while Mr. McCain went off to work,

14   and she just went up.  She had heard about them being

15   left alone.  She, therefore, went up, took the children,

16   brought them home.  The children -- at that point in

17   time we're talking about, obviously, Allena and Samuel,

18   because those are the two children that at that point in

19   time were living with their father.

20       Of course, Ashlee, the child that was born out

21   of wedlock, was, in fact, living with Ms. ████, Audrey

22   Franks' sister.

23       It was about, what -- I don't want to try to

24   put it in a time frame arrived, but it was when they

25   moved to 66th Avenue that, in fact, she did likewise as

26   far as Ashlee is concerned.  She went up to her sister's

27   house and got custody of Ashlee.  I don't think there

28   was any strange manner.  She said, "I want custody of my

1   child"; she brought Ashlee down.

2          Why is this important?  It's important because

3   of the sequence of how things allegedly occurred in this

4   case, and going particularly to the time frame.  The

5   children were there beginning -- the two older children

6   beginning in July of the year 2000, and the allegations,

7   as it is made by Allena at this point, is the first

8   incident happened less than two months later,

9   approximately two months.  So you would have this young

10  child, who is now with a new stepdad, who is being

11  molested by that stepdad and says nothing.

12          You are going to hear evidence as to how that

13  actually took place.  What occurred was that Allena has

14  a boyfriend, and you're going to hear testimony from the

15  mother that Allena would never lie about anything, and

16  she lied about having a boyfriend.  She had a boyfriend.

17  They were there with the boyfriend, Samuel, and Allena.

18  The mother was away, I think, at that time.  She was

19  away as far as trying to earn some money.  And they

20  become involved in an argument.  The ones involved in

21  the argument were Samuel and Allena's boyfriend.  And

22  what they arguing about is a monopoly set, and Samuel

23  gets really ticked off at the boyfriend because of the

24  way he was treating him.

25          So Samuel goes into a room that he shared with

26  Allena.  In that room, he goes into her journal or

27  diary -- she calls it a journal.  It's a diary.  He

28  finds a notation in that journal that -- where Allena



DIANNE J. DORN, CSR #7048

talks about she is going to kill herself.  And he

2  confronts Allena with that passage from the diary.  When

3  he did so, Allena responded by saying -- well, tells on

4  her:  "I'm going to tell our mother about this, that

5  you're talking about killing yourself."

6          She then responds by saying, "Oh, well, don't

7  tell mother.  My stepdad has been molesting me."

8          And then after that occurs, she gets him to

9  promise not to say anything about the fact that the

10  stepdad had been molesting her or had molested her.

11          Once that occurs, at some later point in

12  time she tells a friend of hers from Sacramento named

   Vienna Da'Re, V-i-e-n-n-a, hyphen, D-a-R-e, that she

   believes her stepfather might have molested her.  She

15  never says to that young lady that her stepfather

16  actually molested her.  She tells her she believed he

17  may have, but she was not sure that anything had

18  happened.

19          Those are the two persons that presumptively

20  were told before about some molestation.  The evidence

21  is going to show that at the time that they were living

22  in the first location, that would be on East 18th, not

23  on 14th Avenue -- and Allena testified at a preliminary

24  examination earlier this year and testified throughout

25  that preliminary examination that this was taking place

26  on 14th Avenue -- and that was in that little apartment.

27  She shared the bedroom there with her brother, Samuel.

28          She says that all of these molestations, save



1    and except the very first one in the living room on the

2    floor, took place while she was in bed.  They had bunk

3    beds.  Allena had the upper bunk bed; Samuel had the

4    lower bunk bed.  She will testify that in order to, in

5    fact, do these acts of molestation, it would have been

6    necessary for Mr. Franks to enter the room, go over to

7    the lower bunk bed, get in the top bunk bed in order to

8    do the molestation.

9         When they moved to the second location, which

10   is on 66th Avenue, at that point in time they have

11   trundle beds, and those particular beds, as you all

12   hopefully know, slide up, pops up so they can be side by

13   side.  There the living arrangement changes to the

14   extent that now Ashlee is there in the home.  Ashlee,

15   then, is sleeping in the lower trundle bed, and Allena

16   is in the upper bed.  And again, in order for these --

17   both molestations to take place, it would have been

18   necessary for Mr. Franks to go over the top of the bed

19   of Ashlee in order to get to where Allena was.

20        She will testify, meaning Allena, well, there

21   was some space sometimes between the bed, so he possibly

22   could get between the space between the beds and get up

23   there that way.

24        Now, when did this all come to a head?

25   Approximately a week before February the 6th of 2003,

26   there -- Mr. Franks goes up to Sacramento.  He's

27   originally from Sacramento as well.  He goes up to

28   Sacramento and gets his daughter, one of his two

DIANNE J. DORN, CSR #7048

1   daughters by his prior relationship, and he brings her

2   down to Oakland.

3        Mr. Franks has had some problems with his

4   daughter, because he got into a big fight with his wife

5   one then, mother of -- they weren't married at the time.

6   Got involved in a fight with her, and, in effect, wound

7   up punching both the mother of his child and this

8   particular daughter, because they were scuffling around,

9   and he actually hit her.  And because of that, of

10  course, he was on probation.

11       Then after he gets her down here in Oakland,

12  he just gets into a little argument with her about

13  something, and she wants to go back to Sacramento.  He

14  refuses to take her back to Sacramento:  I take her back

15  when -- I was going to take her back the night before.

16       Mr. Franks and Audrey Franks had been having

17  all kinds of marital problems from the day they were

18  married.  They had been seeing marital counselors off

19  and on from the time they were married.

20       Mr. Franks, though, he had his own problems,

21  becoming actively involved in the church.  He was

22  assistant pastor or deacon in the church.  You're going

23  to hear about this from Pastor Agee.  They were actually

24  getting counseling from Pastor Agee.  The evidence is

25  going to show that there was already a preplanned

26  meeting with Allena because of her own personal problems

27  that she had been having.

28       The evidence will show that Audrey Franks and,

1 possibly, even Allena Franks are bipolar.  They have

2 these terrible mood swings and become highly upset at

3 times, and go from that to the other extreme.

4          Now, the evidence will show that on this date

5 when there's a big argument, not only the week or so

6 before when the daughter comes down, but on the Sunday

7 before the 6th of February, what happens at that time is

8 that Mr. Franks confronts Audrey about a $600, he calls

9 it a SMUD, bill up in Sacramento.  Here it's East Bay

10 MUD.  And he had basically threatened to cut off her

11 credit line so she couldn't charge things because of her

12 misuse of the financial situation.

13          Mr. Franks at the time had basically two jobs.

14 One, he worked out of the union, and that was a job he

15 had, Ironworkers Union, and because of the sort of

16 not-too-stable nature of this, sometimes you don't get

17 jobs.  He had already started his own landscaping

18 business.  He had been doing that for about a year.  He

19 was the primary breadwinner for the family.  Audrey did

20 not -- slow down a little bit.  Killing the Reporter.

21 She's going to hate me.

22          Audrey did not work for most of this period of

23 time.

24          Once they have this big argument, Audrey takes

25 the kids after he goes to work on Monday morning and

26 leaves.  He comes back home Monday evening.  Audrey and

27 the kids are gone.  He doesn't know where they are.

28          Next day, Tuesday, he goes to Bible study,

DIANNE J. DORN, CSR #7048

Loser stock Form B

Cotty USA 1-800 255-5040

1    which he always did, and the kids are there.   No

2    problem, no animosity.   Talks to Allena, Samuel.

3    Nothing seems to be amiss.

4             On Wednesday, he -- uh, Audrey comes back to

5    the house with the kids.   She gets some clothes, stays

6    there overnight, and she leaves again.

7             Little more background on what was going on

8    with Allena.   When she was in Sacramento, she was

9    basically a straight-A student.   Going exceptionally

10   well in school; no problems.   She comes down to Oakland.

11   Within a very short period of time, her grades

     deteriorated.   She was basically getting Cs and Ds, and,

     in fact, she was taken out of school by her mother,

14   Audrey, and put on sort of home study, and this is why

15   she had driven back up to Sacramento and dropped Kisha

16   off on this occasion, is because the actual, quote, home

17   study supervisor was actually in Sacramento.   So Audrey

18   could drive her up there for the purpose of meeting with

19   this instructor to say how are you doing on your home

20   studies.

21            It was after they came back on this occasion,

22   which would have been the 6th itself, that she then goes

23   to Pastor Agee and says, "I want to write you a note,"

24   because she didn't actually tell him what happened.   She

25   says, "I want to write it out for you."   So she then

26   proceeds to write out this statement about, "My dad has

27   molested me."

28            Now, up to that point in time, she had never

1    indicated to Audrey Franks that anything had been going

2    on between she and Mr. Franks.  Audrey Franks herself

3    will tell you that she asked many, many times whether or

4    not there was anything wrong with not Mr. Franks, but

5    with any man, and, of course, she said never.  Nothing

6    was happening between them or anyone.

7         She also will tell you that she believes that

8    Allena would never lie.  But she also believes that

9    Allena, number one, never had a boyfriend, so she

10   wouldn't lie; she was unaware she had, in fact, had one.

11   However, when we were at that preliminary examination,

12   she sat through the preliminary examination audience, in

13   the audience, just like these people, so she heard her

14   daughter testify that, in fact, she had a boyfriend.

15        Audrey will testify that the first time she

16   ever knew about anything possibly going on as far as her

17   husband and Allena was on the 6th of February of 2003

18   when she was told so by her, uh, pastor.

19        Now, in family, Mr. Franks was contacted twice

20   on that day by Audrey.  They already had an appointment

21   to be there with the pastor relative to their own

22   problems.  And Allena will tell you that she had gone

23   there to discuss, quote, other issues in the course of

24   what she described when she talked to the police

25   officers in this matter.  Those other issues, she

26   couldn't explain what the other issues were to the

27   police officers who were investigating the case.

28        She will explain to you that the other

Laser stock Form B

Corby USA 1-800-255-5040

1   issues -- now, what Allena will tell you is that

2   Mr. Franks had struck his daughter, and, therefore, she

3   thought he had -- she heard some rumbling around.  She

4   thought he had, and, therefore, that was the reason she

5   went over there to talk to Pastor Agee.

6           Well, the evidence is going to show that was a

7   prescheduled, planned meeting, and certainly that was

8   not the reason she went over there to talk to Pastor

9   Agee.  She had already planned to be there.  The entire

10  family had.

11          Finally, the evidence will show that

12  Mr. Franks was arrested that same day.  Officers came up

13  after he had been called twice to be reminded to be

14  there, and he, in fact, then went there as he was

15  supposed to, and he had always intended to, and was

16  arrested.  Evidence will show that he then was -- posted

17  bail; was then released because he posted bail.

18          After he posted bail, then they came out a few

19  days, week or so later -- I forget how long it was --

20  and rearrested him.  Rearrested him this time on the

21  bases that he had a probation violation, and, therefore,

22  put him in custody for that reason, and he remained in

23  custody.  And, of course, he could not make bail again.

24          And the evidence will show to this day and

25  point in time, Mr. Franks has never molested his

26  daughter, stepdaughter Allena, or anyone else, and I

27  have every confidence at the conclusion of the testimony

28  you hear from this witness stand, you'll find Mr. Franks

Laser stock Form B

Colby USA  1-800-255-5040

# EXHIBIT COVER PAGE:

Exhibit: _____B_____

Description of this exhibit:

Number of pages of this exhibit: __27__ pages

JURISDICTION: (Check only one)

_____Municipal Court

__✓__Superior Court

_____Appellate Court

_____State Supreme Court

_____United States District Court

_____United States Circuit Court

_____United States Supreme Court

_____California Department of Corrections, 602 Exhibit.

_____Other: _____

Exh. B

1  converse with you concerning the trial or any matter

2  connected with the trial, and it is the duty of the

3  jurors not to form or express any opinion thereon until

4  the cause is finally submitted to you for decision.

5          We'll see you at 10 minutes to 12:00.  Thank

6  you.

7          (Whereupon, the jury exited the courtroom at

8  11:36 a.m.)

9          (Recess taken.)

10          (Whereupon, the jury entered the courtroom at

11  11:54 a.m.)

12          THE COURT:  The record should reflect the jury

13  is present.  Counsel and Defendant are also present.

14          Mr. Broome, would you like to present your

15  closing argument?

16          MR. BROOME:  Thank you very much, Your Honor.

17          <u>CLOSING ARGUMENT BY MR. BROOME</u>

18          Your Honor, Ms. Leventis, ladies and

19  gentlemen, good morning.

20          THE JURY:  Good morning.

21          MR. BROOME:  First, let me thank you on behalf

22  of Mr. Franks and myself for sitting with us through

23  this trial.  I know it's been a little drawn out.  For

24  the number of witnesses, I think we're about on schedule

25  where we would be at this point in time.

26          It's a very important duty that you perform.

27  Let me remind you of something we've talked about

28  throughout these proceedings, and that is the entire

1  burden of proof beyond a reasonable doubt is on

2  Ms. Leventis.  And I start with that because of some of

3  these suggestions that were made about the credibility

4  of the witnesses, and what impact that should have as it

5  relates to Mr. Franks' testimony.  And we make no secret

6  of the fact he told you he had been arrested, and that

7  arrest was for drugs, and, by the way, primarily in 1987

8  and 1989.  And the one incident, other incident,

9  involved where he struck his daughter, he fully

10  acknowledged that he did.

11       In this case, he's having a trial because he's

12  innocent.  Judge Dorado will shortly be reading you the

13  instructions to the jury.  You'll have those

14  instructions with you in the jury room.  It is very

15  important, because there are a number of instructions

16  you need to focus upon.  First, let me sort of lay the

17  framework for the alleged molestations in this case.

18  They are very important; the framework, that is.

19       The problem that Mr. Franks has is he loved

20  Audrey and still does too much.  That's his major

21  problem.  That's what brought him here today.

22  Obviously, she does not reciprocate totally of those

23  feelings, because she has told you here in this

24  courtroom, she was planning to leave him; had been

25  planning, as a matter of fact, for approximately

26  six months.

27       I ask you to take a look at the history of the

28  family relationships and of Audrey and of Raymond and

1  how they got together.  It is very important, because I

2  think that gives you the picture of Audrey that caused

3  this particular situation to develop and caused there to

4  be these allegations against Mr. Franks.  Not that they

5  developed immediately in the course of that marriage,

6  but they developed over a period of time.

7          You recall the marriage that Audrey had to

8  Allen McCain.  And in the midst of that marriage, after

9  having two children, she decided to go into the

10  military, somewhere to the shock and chagrin, obviously,

11  of Allen McCain, and, of course, he testified here that

12  he was not, in fact, in favor of that.  And then

13  thereafter, you have a situation where she becomes

14  pregnant by some soldier.  And during that, as a result,

15  of course, she was released from the military; they

16  don't allow you to be pregnant in the military.  And she

17  returns home.  Her testimony about that gives you the

18  first inclination of the dishonesty of Audrey and where

19  she is coming from as far as these incidents are

20  concerned.

21          What does she tell you?  She got up there on

22  the stand, swore to tell the truth, and testified that I

23  had already separated from Allen McCain at the time that

24  I became pregnant by this soldier, and, in effect, had

25  nothing to do with the fact that they, in fact,

26  separated and divorced.  Allen McCain got on the stand,

27  testified, told you that it had everything to do with

28  how the separation and divorce occurred, because my wife

1  comes back, tells me she's pregnant by somebody else.

2         What other things about that very situation

3  does she tell you that gives you an indication of where

4  she is coming from?  She tells you sitting on that

5  witness stand that she had not seen nor heard of nor

6  knew where the father of Ashlee was.  What did

7  Mr. Franks testify to?  Not only did she know who the

8  man was, where he was; he had visited her on a different

9  occasion, picked up Ashlee, and taken her on an outing.

10  Why did she lie?

11         She tells you that she did not even want

12  Ashlee, and, as a matter of fact, demonstrated that to

13  you to some extent by giving Ashlee to her sister at the

14  time that she was born; a prearranged agreement, because

15  she didn't want to abort the child.

16         She then, upon taking the children for, I

17  guess, summer or regular visitation, she really didn't

18  visit that often.  From the testimony of Mr. Franks --

19  strike that -- Mr. McCain who testified, but certainly

20  she would see the kids then, occasionally pick them up,

21  and she, in the instance of both Allena and Samuel, just

22  picked them up one time driving back down to Oakland

23  says, "You guys aren't going home."

24         Now, she gave a different scenario about that.

25  Her husband -- ex-husband, Mr. McCain, gave somewhat of

26  a similar case, but in reality, Allena tells it all.

27  She said, "I was told while we were driving down to

28  Oakland you're not going back to Sacramento."

1       It was raised as to what motive would this

2  young, 13-year-old child have?  What possible motive

3  could she have for wanting to tell this story and to

4  point the finger at Mr. Franks and to get him into all

5  kinds of trouble?  Well, she had a clear motive, a very

6  clear motive.  She said from day one she arrived in

7  Oakland, she did not want to be here.  She did not like

8  Oakland, she does not like Oakland schools, and anything

9  about Oakland.  All of her friends are in Sacramento.

10  Ladies and gentlemen of the jury, where is she living

11  now?  In Sacramento.  She's back home where she wants to

12  be.

13       This is not the first time.  From the

14  testimony, we heard here that Allena has made such

15  allegations.  Nakisha Franks testified and told you

16  about two incidents where Allena had indicated that

17  her -- Allena had accused her natural father of

18  molesting her.  Now, you saw Mr. McCain testify here.

19  Obviously, somewhat guarded.  I don't know anything

20  about the man.  But the reality is that there was also

21  an allegation that -- I believe by Felicia Young that

22  indicated that Mr. McCain had also allegedly molested

23  Audrey's sister.  So this molesting is sort of

24  ingrained, from all indications, in that family history.

25       Now, Allena -- think of this:  Allena had been

26  here with this man, Raymond Franks, and his wife or

27  mother only about four to five weeks at the time she --

28  the time the first molest takes place.  You talk about

1    the development of a situation of trust?  Where is it?

2    There is no way in four to five weeks that some

3    relationship of trust is going to be developed between

4    this man, Raymond Franks, who Allena basically didn't

5    like from day one, didn't like anyone in his family from

6    all indications, even though she verbalized up here she

7    did.  But the reality is she didn't.

8         The reality is you can demonstrate by the

9    facts -- I won't go through all of the details of that

10   Great America fiasco and the remarks she made about the

11   parents of Mr. Franks.  I will only point out to you,

12   really interesting in a situation like this:  How did

13   she refer to her stepfather?  She called him Ray.  Ray.

14   That's not a development of a father-daughter kind of

15   relationship.  She was always, from all indications,

16   somewhat distant from him from that perspective, even

17   though she obviously continued to engage in, quote, the

18   kissing and hugging of Mr. Franks before she went to bed

19   every night.

20        Now, think of this:  This is a situation where

21   you are being molested by this Raymond.  Every night

22   before you go to bed, you go into his room and sit on

23   his lap and hug and kiss him.  That's not logical.  It

24   doesn't make sense.  No hesitancy at all.  She says, "I

25   did it.  I did it right up until the time I went in to

26   tell Pastor Agee about the molestations."  As did

27   Ashlee.

28        Fear of Mr. Franks?  Allena herself testified.

1  He never hit her; he never threatened her; he never in

2  any way threatened any member of her family.  And as a

3  matter of fact, during the entirety of the occurrence of

4  all these molestations which supposedly took place over

5  a period nearing two years, never once was a word

6  uttered.  Mr. Franks never said one word to her; she

7  never said one word to Mr. Franks.

8          Ladies and gentlemen, come on, that's

9  ridiculous.  You mean to tell me this extremely bright,

10  astute young lady, obviously very mature for her years

11  and, obviously, a bit worldly, would merely lay there,

12  do nothing, say nothing while she's being molested?  I

13  don't think so.  I don't think so.  That there would be

14  never any kind of threat or suggestion of something to

15  cause her to want to submit herself to this?  I don't

16  think so.

17          Before she came into this courtroom to

18  testify, she had never given anyone any specific details

19  about the molestation.  Only thing she had talked about

20  with of any kind of detail was, "I was laying on the

21  living room floor one day asleep, and Mr. Franks came in

22  and started feeling on me and kissing on me."  And that

23  was the first molestation.  Other than that, she never

24  gave any detail.

25          You saw the CALICO tape.  You see none, none.

26  The statement she gave to Officer Williams, none.  No

27  details.  Those details seem to have developed between

28  the time even when she testified at the preliminary

1  examination.  None.  So somewhere between May 3d and

2  this trial, details came out.

3        She comes into court, testifying very

4  specifically about these, quote, four to five specific

5  incidents.  See, look at once they arrived here, how

6  they were treated and by whom they were disciplined.

7  Audrey was a disciplinarian in the family.  Mr. Franks,

8  they all testified -- you heard Samuel say he punched me

9  one time in the chest.  Punched one time.  Audrey was

10  the disciplinarian in the family.  She whipped them with

11  belts, whipped Allena one time with a cord; had that

12  discussion what kind of cord:  Ironing cord versus

13  extension cord.  She even punched them on occasion;

14  certainly punched Allena, also punched Samuel in the

15  chest.

16        And I use the word "fear" a lot.  They had

17  fear of her.  But, you know, Mr. Franks, it wasn't like

18  fear; it was standoffish; you know, she was the boss.

19  But we know that according to the testimony of Rashaunda

20  Franks, Kisha Franks, and Audrey herself, the

21  description of the number of whippings and the kind she

22  administered were more according to Audrey's testimony

23  than even the testimony of the kids.  She told you she

24  did it.  Why is this important?  Because all of these

25  things go to the credibility of the witnesses.  And I

26  certainly agree with Ms. Leventis:  Credibility of

27  witnesses is the key element of this case.  You cannot

28  find anyone guilty of these types of crimes on

1   credibility of Allena Franks -- Allena McCain.

2           You see, there are four instructions that you

3   should take a close look at.  One, of course, is 2.20,

4   speaks to the credibility of witnesses, and 2.13, which

5   talks about consistent and inconsistent statements, and

6   certainly 2.90 talks about reasonable doubt.  And

7   Ms. Leventis, benefit of this machine, put them up on

8   the board for you.

9           The elements that you have to look at:  The

10  extent of the opportunity or ability of the witness to

11  see or hear or otherwise become aware about any matter

12  about which the witness testifies.  Well, Allena McCain

13  is the only witness who testified to sexual misconduct

14  being perpetrated against her in this case, and those

15  are the first Three Counts.  There were two others who

16  could have testified to such misconduct if, in fact, it

17  had occurred.

18          Ladies and gentlemen, in the first incident,

19  the family lived on East 18th Street in this little,

20  small apartment.  It was described to you, and I had

21  Mr. Franks do this diagram, but it's not to scale,

22  obviously.  But you remember Allena tried to give you

23  the size of the little room they lived in and not the

24  size of the entire house.  And initially, they were

25  sleeping on the futon there, she was with Samuel.  They

26  gave conflicting testimony about why she got off the

27  futon.  He says it was because he kicked a lot, kicked

28  her in the face.  She said he wet the bed, didn't want

1  to bother to get out of there.  She left the futon.

2         Then there was the bunk beds.  In order to get

3  to where she was, it was necessary for Mr. Franks

4  somehow or other to get up that bunk bed, up into that

5  upper bunk, without awakening Samuel.  And the same

6  becomes true later with the trundle beds when they move

7  over to 66th Avenue.  Somehow or another, he would have

8  had to move himself past those beds or between those

9  beds without awakening at that point Ashlee.

10        Now, ladies and gentlemen, that is utterly

11 ridiculous to sit here and say that that could have

12 happened over the many, many, many, many times she said

13 it took place.  I think she said something like 10 times

14 or more, or two times a month for the first year, and

15 added about the same or similar number once they were on

16 66th Avenue, and not once were either of those other

17 children awakened or disturbed?  Not once?  I don't

18 believe it.  I don't think so.  I don't think you'll

19 believe it.  Just not logical.

20        Samuel McCain testified and told you that he

21 was not aware of any molestation of Allena by Raymond

22 Franks, and the information he has about any molestation

23 came from Allena.

24        This all emanates somewhere from that diary.

25 Yes, that diary.  Because Samuel looked into her diary,

26 and as he testified, more than once.  Nowhere in that

27 diary did Samuel see anything about Allena being

28 molested by her stepdad.  Nowhere.  She says it was in

1   there.  She had indicated before she came here, we had

2   to go back with the PX testimony, preliminary hearing

3   testimony.  She indicated here, well, that I didn't put

4   it in there until later for -- the last time I put that

5   in there was the time when Topaz had the diary, and it

6   came back to me, and it was put in there then.

7           Well, it doesn't make a lot of difference

8   whether or not, in fact, she said it was put in there

9   then or not.  Why?  Because she didn't have the diary

10  when it came back.  You recall the testimony of Samuel,

11  "Where did you get the diary from, Samuel?"

12          "I took it out of Topaz's backpack."

13          So Allena would have seen the diary when it

14  came back.  Why would lie and conflict come back about

15  what happened to the diary?

16          Look at that CALICO tape.  She says Samuel was

17  tearing pages out of that diary.  She didn't testify

18  about anything about that.  She testified here that she

19  did -- at the preliminary examination, she tore through

20  it together.  Why did she tear it up?  That's evidence.

21          She testified further that she had this -- had

22  started this electronic kind of diary.  She had given

23  statements to that effect to Officer Souza.  Officer

24  Souza, go out, pick it up, say so-and-so listened to it.

25  Didn't say anything on it.  She said okay, there was

26  nothing on it.  Fine way to do the investigation if you

27  don't have the witness or the person; go and review it

28  and decide what should happen to it.  Why did she look

1  in the diary?  What was she so afraid of Samuel finding

2  in that diary?  Primary thing appears to be the fact

3  that she, quote, felt like killing herself, end quote.

4          Now, she came in here and testified to you

5  under oath that the reason I didn't want him to testify,

6  tell mom about anything in that diary, was because I

7  used a curse word or some curse words in there.  Well, I

8  don't think that's really a very strong reason, but your

9  mom would like to know what's in your diary.  I think it

10  was because she felt like killing herself.

11          The significant part of all of this is that is

12  when the first allegation was made, you see.  Nowhere

13  has she ever told anybody about any molestation, because

14  Samuel looked in that diary, then she says, oh, I was

15  molested by my stepdad.  That's why I'm acting -- why

16  I'm acting over this diary thing.  It really wasn't that

17  big a deal.  Well, why did we not hear from Topaz?  And

18  those other kids that were there?  Why?  Because Allena

19  never told anybody that all these other people had been

20  in the house when this, quote, diary situation developed

21  and all this concern about what she should -- her mom

22  should be told.

23          She testified at that preliminary examination

24  and brought it out here in court for you that she said

25  on 20 to 25 occasions during the course of that

26  preliminary examination, that she lived on East 14th

27  Street.  You have lived here for over two years.  Don't

28  sit here and tell me because you're emotionally

1  distraught, you don't remember what street you lived on.
2  I don't think so.
3        And she continued on throughout that prelim
4  with that sort of response, and then her explanation
5  here is something to the effect, I was so distraught, I
6  just sort of put that out there.  What's the real
7  reason?  The real reason is because that's what Topaz
8  did.  That's the real reason.  That's why she had that
9  fixation with East 14th Street, and that's where this
10  13-year-old girl would go to visit with her boyfriend.
11  At 13.  That's where, with her mother's condemnation,
12  she would go to see Antoine, at 13 years of age.
13        And I don't really care to share the thought
14  that she was this poor, little, naive young lady.  You
15  saw how she was dressed when she came in here; dressed
16  like a little minor child to me.
17        And in addition to that, you note on that
18  tape, that CALICO tape, she is talking about things like
19  going to get facials.  And equally as significant, look
20  at her attitude towards the whole process.  You're going
21  to have, because it's in evidence, this statement that
22  she wrote out to the pastor.  And as the pastor said,
23  this young lady who was so terribly distraught, seemed
24  to have written out a pretty nice, little statement to
25  me.  I see nothing shaky and upsetting about her
26  writing.  Looks very neat to me.  Appears when she made
27  the statement, went back, scratched it out, made
28  corrections.  Very well-written.

```
 1          You will also have those diagrams so you can
 2   look at the true nature of the rooms, at least how they
 3   were situated.  As you recall, you have that incident
 4   where supposedly Audrey Franks, who testified she had
 5   never been told anything about any molestation by
 6   Allena, even though she asked time and time again,
 7   numerous occasions in her statement.  It is impossible
 8   for her to have done what she, Audrey Franks, said she
 9   had done.  She said she had come out of their bedroom
10   and gone into the kids' room and looked and couldn't see
11   Mr. Franks in there.  Then she had come back out and sat
12   in the bathroom and waited to see what happened, and she
13   then saw him coming out the bathroom -- out the bedroom
14   of the children.  It is not possible based on the
15   diagram and the location, which was also described by
16   Allena, but not possible for you to see into that
17   bedroom from the bathroom.
18          Also, of great significance -- I don't care
19   where you place the bed in that room, or in the
20   testimony of Allena, I don't care where you put the bed
21   in that room:  You stand at this front door, you can see
22   everything there.  That's Allena's testimony.
23          So what is the truth of that situation?
24   Exactly what Audrey had told the officer way back when
25   on February the -- when she gave her statement, whatever
26   date she gave her statement to the officer,
27   February 5th, 6th, 7th, in effect, she had this feeling,
28   and she had gone and looked.  And as she walked out, she
```

1  saw Mr. Franks walk out of the room.  And that makes

2  logical sense.  The rest of this stuff she came up with

3  by the time she came here makes no logical sense at all.

4       What else makes no logical sense, not make it

5  out to what they say to be?  She was asked that very

6  specific question by Ms. Leventis, I think:  "Did you go

7  talk to Allena after this incident took place?"

8       And she said, "No, I never talked to Allena

9  that night."

10       Allena says, "Well, yes, my mother came in and

11  shook me and woke me up."

12       That's a clear conflict.  Clear conflict over

13  a significant matter, and also adding to their previous

14  statements, which they have done throughout this

15  process; not just Allena, but also Audrey.

16       Samuel said he had never seen any molestation

17  or been told about any molestation by the stepdad, his

18  stepdad, save and except one incident where it's blurted

19  out.  And what does he do by the time he gets in here?

20  He now has certain recollections of that incident that

21  took place that night that Mr. Franks was coming out of

22  the bedroom.  Never told anybody about it in his life,

23  never before here.  Things kind of developed.  All these

24  people just kind of enhanced their story.  Well, they

25  got it from somebody, and Allena said we, the family,

26  have been talking about this since it happened.

27       If Topaz hadn't shared that diary, and she,

28  therefore, obviously would have been looking through it,

1  she would have been a classic witness just to come in

2  here and say, gee, you know, I was sharing that diary

3  with Allena, and she put in that diary that she had been

4  molested by her stepdad. But she didn't. She's not

5  here.

6         And you say can't find her? Well, Allena says

7  I called her, talked to her last month or so ago. No

8  Topaz. First time we ever hear about Topaz is when we

9  get here in trial, because it came out through the

10  testimony. That's what happens when you get up and

11  start testifying. The question's going to be asked of

12  you, no way could anticipate, and then you get caught in

13  these little boxes.

14         And Topaz is a classic box for them on that

15  diary issue, simply because there is no way on earth

16  that a witness of that crucialness would not, should not

17  be there if she, in fact, was that involved in that

18  diary, because she not -- because Allena decided not to

19  tell anybody about that until she got here.

20         Sometimes I go too fast; have to slow down.

21         She never wrote anything about being molested

22  in that, quote, notebook, end of quote, that she

23  mentioned to the CALICO worker, Vivica. She talked

24  about things like Ray was always giving her money. We

25  never heard of that, either, before we got here, but we

26  knew it was on that CALICO tape. She didn't testify to

27  that here.

28         Now, look at the character and quality of the

1   testimony.  You better believe you better look at the

2   character and quality of the testimony and demeanor in

3   which she testified.  She had that initially, as soon as

4   she got on the stand.  Very typical.  After that, she

5   said, she was testifying, cool as a cucumber.

6        I would refer to you again the letter she

7   wrote to -- in the correspondence with Pastor Agee, that

8   smiling face she put on there.  Show you her attitude

9   towards it at that time.

10       And in addition to that, her reaction on that

11  CALICO tape once Vivica left the room, waving at the

12  camera.  That was her attitude when she talked to Pastor

13  Agee; that was her attitude when she talked to the

14  CALICO people.  We want you to see that.  See what her

15  attitude was like.

16       She certainly had a bias and motive, as I

17  indicated earlier.  She had been a straight A student

18  when she came here from Sacramento.  Grades fell,

19  depending on whose story you want to accept.  Audrey

20  says they just fell to basically Bs and Cs.  She was

21  doing bad, so I decided to take she and Samuel out of

22  school to do home study.  She had time; she was on

23  unemployment at the time.  Mr. Franks says they fell to

24  Ds and Fs.  Actually, Allena didn't disagree with that.

25  She said I got some Ds, not Fs.  She certainly got Ds.

26  She did very poorly.  That was her first

27  starting-out-of-the-box performance at school.

28       She gave different reasons why.  Her primary

1   reason seemed to be she just didn't want to be away from

2   her friends in Sacramento.  She talked a lot about that,

3   in Sacramento.  She liked being in public schools.

4   She's a social kind of person, and she certainly wanted

5   to do things like probably be involved socially with the

6   other kids.  She couldn't get that in homeschooling.

7           We know that at some point in time, the real

8   basis for these charges developed, and they weren't

9   developed back in the year 2000, 2001, but rather at the

10  end of 2002, in the first part of 2003, because that's

11  when Audrey had apparently made up her mind she was

12  going to leave Mr. Franks.  She told Arlean Griffin this

13  when she went up there at the end of January or first

14  day of February.  I think we pretty much narrowed it

15  down to that now.

16          After this little argument, I call it an

17  argument, Mr. Franks and Audrey have a discussion about

18  the water bill, a $600 water bill.  During the course of

19  that discussion, Mr. Franks dares to suggest that he's

20  going to put some bills in Audrey's name and have other

21  bills in his name, and they can pay for the bills that

22  way.  She did not like that and, in effect, told him

23  that if that occurred, he could basically get out of

24  there and better not come back.  In fact, she called the

25  cops.  Well, through Pastor Agee she eventually called

26  the cops.

27          Allena's motive was apparently to get back to

28  Sacramento, back to Sacramento because she didn't want

1    to have any part of Oakland.

2    Look at the chronology of how these things
3    occurred. July of 2000, Allena, Samuel picked up by the
4    mother, come to Oakland. In a statement to Allena -- to
5    the CALICO worker, Allena, and Pastor Agee said she had
6    just moved to Oakland when her stepdaddy, Ray, started
7    molesting her. Just moved. And you want to accept her
8    testimony by a month to five weeks? November of 2001,
9    family moved to 66th Avenue. No indication of anyone
10   being told of any abuse up until then, save and except
11   we have the incident with Samuel and the diary.

12   About a month later, Ashlee come to live with
13   the family; then a switch of the bedrooms around, so
14   Ashlee is in there with her now. No complaints about
15   any molest.

16   Vienna Da'Re testified. She testified that
17   Allena told her about a year before she was sitting
18   there talking to the sergeant that she had been molested
19   by her stepdaddy, but her wording is very important for
20   you to consider, look at, and understand so you have no
21   doubt there had been no molestation in this case.

22   My good friend, church-going member, Vienna
23   Da'Re, I told her that my stepdad had molested me.
24   Well, ladies and gentlemen, what did she really tell
25   Vienna Da'Re? I don't know whether it happened or not.
26   I believe that my father -- stepfather may have molested
27   me, but I don't know. It only happened one time,
28   according to what she tells Vienna Da'Re, her best

1  friend.

2         Well, that's the case, and she's telling her

3  that about a year before February the 18th of 2003.

4  This would put you into February of 2001, and she's

5  telling her best friend she does not know whether or not

6  she's ever been molested.  That's after telling no one

7  else but Samuel, I do believe that my -- I'm ready, want

8  the diary back, because stepdad molested me.  Okay.  So

9  you have two suggestions of molestation, neither of

10  which is supported by any actual factual basis, and

11  both -- and the second and most critical one to her

12  friend over a year later, she says don't know if it ever

13  happened.  If it did, it was that moment in time.  This

14  is her best friend.

15         That's what she told her best friend.

16         Got a hickey on Ashlee's neck.  No doubt it's

17  there; no doubt he put it there, but it is not a

18  criminal act.  Nobody thought it was then, and nobody

19  should think it is now.  Did they treat it like it was a

20  criminal act when it occurred, meaning Audrey and Ashlee

21  and Pastor Agee?  Absolutely not.  Absolutely not.  He

22  gave her a hickey on her neck.  He shouldn't have done

23  that, but that's certainly not a sexual offense.

24         As a matter of fact, it's not right up until

25  the time that Mr. Franks was arrested in these -- for

26  these charges alleged by Allena did anybody ever take

27  that as unlawful, because it was not unlawful in their

28  minds.

1    On that fateful day, that Sunday, I believe it
2  was February the 2d, sort of went back, must have been
3  the 6th.  It must have been the Sunday before, and they
4  had this argument.  Then, of course, Mr. Franks goes off
5  to work the next day.  He comes back; Audrey and the
6  kids aren't there.  We know they've gone up at one point
7  just before then to Sacramento to take Nakisha back, and
8  we know that she has made the statement she plans to
9  leave him.  He comes back home goes from work the next
10  day, Tuesday, and not there.  Still not.  Remember she
11  took a car up to Sacramento.

12    Then told Arlean Griffin that she was going to
13  be leaving and going to go stay with a friend.  On
14  February 4th, Mr. Franks sees Allena and Ashlee at Bible
15  study.  They both see him, speak to him, no animosity.
16  Everything seems fine, except they're not home.  Then on
17  the 4th, comes home -- on the 5th, rather, comes home,
18  they come back home.  Do they stay there?  He returns
19  home on the 5th in the evening; gone again.

20    Then when they come back on Thursday,
21  presumptively from going up to Sacramento for that class
22  that she would normally go up there for, Audrey's taking
23  the kids, Allena and Samuel, with her.  She says I had a
24  discussion with Allena, and testified that we talked
25  about my future with Ray.  So she told you herself that
26  she was considering leaving Raymond.

27    What is even more significant about that, in
28  the testimony that Allena gave, I asked her about that.

1  She says, "I never had any such discussion with my mom

2  about anything about the relationship with Raymond."

3           Another major conflict between the two, trying

4  to put their story together.  She said, I had scheduled

5  Samuel and myself, had scheduled an appointment to go

6  see Pastor Agee.  Now, this is very important, because

7  it goes to the total lack of credibility of Allena and

8  Audrey.  Both of them sat here and testified on this

9  witness stand that never, never would Allena go over to

10 see Pastor Agee on appointments by herself, for herself,

11 because she had made that statement and rescheduled her

12 appointment.  It was about Kisha, and we were going over

13 there.  "I" was going over there; didn't say "we."  I

14 was going over there to tell them about that bad scene

15 that happened between my stepdad, Ray, and Nakisha.  She

16 had never done that when there had been bad situations

17 before between them.

18           More importantly, she makes the statements,

19 and Audrey makes the same statements that basically the

20 kids would not be seeing Pastor Agee in sessions where

21 the children were not involved.  I think Audrey would

22 have them, as a group of kids, talk with him.

23           What did Pastor Agee tell you?  I have been

24 counseling Allena off and on for a number of years since

25 I've been down here.  I've been with her on several

26 occasions by herself, several occasions prior to

27 February the 6th.  Never did she tell me anything about

28 any molestation.

```
 1            More important than her not telling him
 2   anything about it is the fact that she misrepresented
 3   the view she actually saw him individually before, as
 4   did the other child, Samuel, individually before.  See,
 5   that's a lie not necessary to tell, but it goes to the
 6   matter of this young girl's credibility, the fact she
 7   would sit here and lie.  Just doesn't bother her.  The
 8   same way she made all those statements about living on
 9   East 14th Street when she knew very well that she didn't
10   live there.  It just doesn't bother her.  Her goal is to
11   get back to Sacramento, and that is what she did.  She
12   didn't care how she did it.
13            There's the conflict between the two of them
14   about, quote, moving the appointment up, end of quote.
15   Not that it would make any grave difference, because
16   presumptively, Mr. Franks would make the scheduled
17   appointment he had.  Anyhow, "Remember to come to the
18   appointment, remember to come to the appointment."
19   Never happened before.  Never happened before, all the
20   times he's been going to those counseling sessions.
21            And this particular time, they wanted him to
22   get over there so he could be arrested.  And we know
23   from the testimony you heard here that he got arrested
24   twice in this case.
25            First, he's arrested, and on February the 6th,
26   pleasant day, you recall all the gymnastics of trying to
27   determine what was in the statement he gave, when he
28   basically told him everything he knew, what was going
```

1  on, and the fact he had certainly never molested Allena;

2  why she came up with these crazy allegations.  They sat

3  him in a room for over three hours before they took a

4  statement from him, and that statement did not go to any

5  of the -- many of the things that were contained in the

6  discussion that happened before they -- the way they do

7  it in police work, they sit you down, get you nice and

8  soft, talk to you about what they want to talk to you

9  about.

10        Once they get a statement, they say now we're

11  going to go on tape.  That's when they pull out the

12  tape-recorder, ask you what was happening, and they ask

13  you questions, and you give answers.  If you're sitting

14  there and after, you know, let me tell you anything

15  about what you want to know now that you've arrested me.

16        Audrey Franks made a statement to Harvey

17  Yarbrough, the other investigator:  Allena would never

18  lie about anything.  That's what she said:  Would never

19  lie about anything.  Well, now, she lied about a lot of

20  things.  And number one, she also told Harvey Yarbrough

21  that Allena never had a boyfriend.  She said that.

22  Never had a boyfriend.  She got up here on the stand and

23  told you yes, she did have a boyfriend, but the

24  boyfriend was somebody that myself and Raymond agreed

25  upon.  Well, Raymond didn't have any say in that.

26  During the entirety of his marriage, he had nothing to

27  do with who Allena saw and what she did.

28        Told Harvey Yarbrough she had obtained a

1  restraining order to keep CPS from taking the kids from

2  her.  Well, all we know is she files.  We also know she

3  continued to see him after they were, quote, separated

4  and with that restraining order in existence.

5          Finally, she told him she wanted to him to go

6  to prison.  I want you to go to prison, because then we

7  can -- you can get out, and we can have our life

8  together, and you could be back with me and the kids.

9  Well, ladies and gentlemen, you are a convicted child

10  molester.  I don't think you're going to be with those

11  kids again, because I don't know where Audrey was coming

12  down with that.  She certainly gave every indication she

13  was separating from Mr. Franks, going back to when he

14  was in custody that first time.

15          Go on about the car.  She comes to see

16  Mr. Franks in custody.  I'm going to move Atlanta.  She

17  already cashed the income check.  She says I owe money

18  to the IRS.  The point is, she sent it in.  And also, we

19  know that she talked of selling the house.  Got this

20  nice house.  And she was just going to give all that up,

21  go off to Atlanta for whatever reason.

22          Please look at testimony of this young lady,

23  particularly where she talks about what went on with

24  regard to that diary.  Instruction 2.13 to consider in

25  your deliberations, that instruction which basically

26  states evidence that at some other time a witness made a

27  statement or statements consistent or inconsistent with

28  his or her testimony in a trial, they may be considered

1  by you not only for the purpose of testing the
2  credibility of a witness, but also as evidence of the
3  truth of the facts as stated by the witness on that
4  former occasion.  And the statements by Allena McCain on
5  a former occasion, she didn't really know whether or not
6  she had ever been molested or not to her friend in the
7  diary.  If you disbelieve a witness's testimony that he
8  or she no longer remembers certain events, that
9  testimony is inconsistent with the prior statement or
10 statements by him or her in describing that event.
11          Section 2.21.2 states a witness who is
12 willfully false in one material part of his or her
13 testimony is to be distrusted in others.  You may reject
14 the whole testimony of a witness who willfully has
15 testified falsely as to a material point, unless you
16 believe, from all the evidence, you believe the
17 probability of truth favors his or her testimony in
18 other particulars.  Those are crucial considerations,
19 because they go to the heart of the testimony of this
20 young girl.
21          I believe you should reject the testimony in
22 its entirety of both she and Audrey, simply because both
23 have testified falsely on material matters in this case.
24          Please do not stray from the burden of proof.
25 The burden of proof is entirely on Ms. Leventis.  The
26 fact that she suggests that the credibility of
27 Mr. Franks goes somehow or other -- I think it was sort
28 of implied that somebody would say that goes somehow or

1   another to the strengths of this case and to the proof

2   of this case.  That's not proper.  That's not proper,

3   because we don't have any burden of proof.  So you can't

4   look at his testimony, say that somehow says you must be

5   guilty, because he wasn't as credible a witness as I

6   thought he should have been or I thought he was.

7        But the bottom line is that should not in any

8   way detract from the burden of proof, which is

9   100 percent on Ms. Leventis to have proven to you by a

10  reasonable doubt that, in fact, Raymond Franks molested

11  Allena McCain and that Raymond Franks committed a sexual

12  act when he sucked on her.  That's her burden.  That's

13  her burden, and she hasn't met it.  Because, you see,

14  the entirety of her case is based on Allena McCain and

15  her credibility.  And if you do not believe beyond a

16  reasonable doubt based on the credibility of Allena

17  McCain that these allegations are true, you have no

18  option but to find Mr. Franks not guilty.  And I see no

19  way, based on the testimony of this young lady, that you

20  can find this man guilty of these crimes, because she is

21  incredible, not credible.

22        In closing, let me note a couple things.  This

23  is my only opportunity I will have to speak with you.  I

24  will not be speaking with you again.  Ms. Leventis has

25  two opportunities to speak with you, because she alone

26  has the burden of proof.  This is a burden that I

27  believe she has failed to meet.  I do not really like to

28  object when counsel is making her remarks.  You note I

1  did not during her remarks. I will object while she's

2  making her closing remarks only if she strays from the

3  facts as I see them and misquotes the law or evidence.

4  Her beliefs as to my views on the case are not relevant.

5  Only relevant thing is what your view on the evidence

6  was. That's the only relevant issue to this point. All

7  the other evidence is in. There is no more. Not going

8  to get into anything else.

9        All the evidence comes from that witness

10  stand. Nowhere else. So in viewing the closing remarks

11  of Ms. Leventis, first question I ask you to pose to

12  her, wherein did you prove beyond a reasonable doubt the

13  charges that were brought in this case? I don't think

14  she can. She didn't, I don't think she will, but she

15  cannot.

16        I ask you to return the only logical,

17  rational, proper verdict in this case; that is not

18  guilty as to all charges.

19        Thank you very much.

20        THE COURT: Thank you, Mr. Broome. We're

21  going to recess until 1:45.

22        Please remember the admonishment not to

23  converse among yourselves, or with anyone else, on any

24  subject connected with this trial, or to allow anyone to

25  converse with you concerning the trial or any matter

26  connected with the trial, and it is the duty of the

27  jurors not to form or express any opinion thereon until

28  the cause is finally submitted to you for decision.

# EXHIBIT COVER PAGE:

Exhibit: _____ C _____

Description of this exhibit: Excerpt from Opening Brief ; Pages 27-33

Number of pages of this exhibit: _____ 6 _____ pages

JURISDICTION:  (Check only one)

_____ Municipal Court

__✓__ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. C

**II.    THE COURT ERRED IN ADMITTING OFFICER SOUZA'S TESTIMONY REGARDING REPORTING DYNAMICS AMONG CHILD WITNESSES ABSENT SUFFICIENT SHOWING OF HIS EXPERT QUALIFICATIONS IN THIS AREA, DENYING APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL.**

**A.    PROCEDURAL BACKGROUND.**

As set forth in the Statement of Facts, *ante*, Allena admitted she had not been able to describe specific incidents beyond the first one in the living room until the time of trial.  (See also Joint Exhibit No. I.)  Her trial testimony adding accounts of masturbation and oral copulation at the apartment, as well as an account linked to her mother entering the bedroom, was new.  Among several other points like Allena's earlier equivocation to her friend, defense counsel stressed her growing new trial accounts in arguing her credibility to the jury.  (RT 1057-1058.)

Against this background, defense counsel at trial attempted to preclude officer Souza from testifying regarding child reporting dynamics. The objection colloquy and relevant testimony occurred as follows:

> PROSECUTOR: Since you've been in the [special victims] unit, from February [2003] up until today, how many child sexual assault cases have you investigated?
>
> DEFENSE COUNSEL: Objection.  Relevance.
>
> COURT: Foundation for this?

27

PROSECUTOR: Lay a foundation for him to explain victims of these crimes and how their statements come out, Judge.

COURT: How their statements are?

PROSECUTOR: There's been some information by [Defense Counsel] the victim didn't give detailed accounts. I'm going to ask the questions how victims generally come forward; how CALICO works.

DEFENSE COUNSEL: Based on what he did after the fact?

COURT: I'll allow some foundation.

SOUZA: Since I've been assigned in the unit, I've investigated 200 cases involving sexual assault and child abuse. Before that, prior eight years as a law enforcement officer, I honestly couldn't tell you ...

PROSECUTOR: With regard to child sexual assault cases and the initial police officer's involvement, do you attempt to take a complete, detailed statement of each and every molest when you first meet the kids?

SOUZA: Not in every case, no.

PROSECUTOR: And in the cases where you do not do that, why not?

SOUZA: Well, um, in cases involving children, especially children, they are often traumatized. They have a hard time talking about these cases. *They're not going to recall all the details initially* ...
....
PROSECUTOR: And based on your experience in these cases, do you find that *even after CALICO, kids tend to remember more as time goes on?*

SOUZA: *Yes. ... victims of these type of crimes don't truly become entirely comfortable. ... They become more comfortable, and they're willing to provide more detail, or they recall things that they might not have remembered initially.*

28

(RT 764-766 [emph. added].)[14]

The court's ruling admitting this testimony without sufficient foundational inquiry establishing officer Souza's qualifications as an expert in the area of opinion was error. The error further deprived appellant of due process of law and a fair trial. This is because admission of unreliable, or at least unfounded, expert testimony, without limiting instruction, explaining the conspicuous reporting delays in this case had great impact on the jury's credibility determinations, resulting in fundamental unfairness and denial of a fair trial in a close credibility case. (U.S. Const., amends. V, XIV; Cal. Const., art. I, §§ 7, 15.)

B.    **THE COURT ERRED IN ADMITTING OFFICER SOUZA'S CATEGORICAL TESTIMONY REGARDING CHILD REPORTING DYNAMICS ABSENT ANY SUFFICIENT SHOWING OF HIS EXPERT QUALIFICATIONS IN THIS AREA.**

The proponent of proffered evidence bears the burden of demonstrating the existence of a preliminary fact which is essential to admissibility. (Evid. Code, § 403, subd. (a); *People v. Lucas* (1995) 12 Cal.4th 415, 466; 3 Witkin, Cal. Evidence (3d ed. 1986), § 1718, p. 1677.)

---

[14] No limiting instruction of any kind was given. No instruction regarding expert testimony was given. (See CALJIC No. 2.80.) The only instruction given to jurors addressed lay opinion testimony. (CT 142.)

29

The issue here is the sufficiency of the foundational showing of officer Souza's expertise to offer his opinions. (Evid. Code, §§ 720, 801.)

Evidence Code section 720, subdivision (a) provides that: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. *Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.*" (Emph. added.) The trial court's determination on the question of qualifications is reviewed under a manifest abuse of discretion standard. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39.) Although a trial court is given considerable latitude in determining the qualifications of an expert, that discretion "is not absolute." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 373.) Further, an expert's qualifications "must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 852; *People* v. *Chavez* (1985) 39 Cal.3d 823, 828-829.)

Officer Souza had only been in the special victims unit for six months. (RT 764.) He received no training in child sexual abuse cases until he entered the unit and the nature of the training was not described. (RT 764.) In the unit, he investigated a variety of crimes including adult

30

sexual assaults, child sexual assaults, and child abuse. (RT 764.) In his six

months, he had investigated "200 cases involving [child] sexual assault and

child abuse." (RT 765.)

This scant foundation is insufficient to qualify officer Souza as an

expert in the typical length of child reporting delays or child reporting

dynamics in sexual assault cases. Are the delays Souza observed related to

child victims, child witnesses, or child suspects? What are the ages of the

children Souza is referring to? Which crime(s) is Souza referring to, child

sexual assault or child abuse? How many, and which type(s) of Souza's

interviews evinced such delays in reporting? How many times had Souza

really encountered initial reporting delays, or growing post-report

accusations, like those that occurred in this case?

Upon objection, appellant was entitled to a foundational

determination of whether Souza was qualified as an expert in child reporting

dynamics. The examination offered here was too vague to establish

meaningful qualification in this particular subject, as opposed to the related

subject of police interviews of children generally. (*People* v. *Hogan*,

*supra*, 31 Cal.3d at p. 852 [fact witness had observed many bloodstains did

not qualify him to testify on particular subject of blood spatter analysis];

*McCleery* v. *Bakersfield* (1985) 170 Cal.App.3d 1059, 1072 [without more,

fact witness had investigated hundreds of officer-involved shootings did not

qualify him as an expert in particular subject like the reasons why officers give conflicting statements].)

Even a treating physician may not be qualified to render an opinion on specialized medical causation issues. (*Salasguevara* v. *Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 386.) That Souza had interviewed children of unspecified ages in various postures (witness, victim, or suspect) and had encountered an unspecified number of reporting delays of unspecified duration, in fact, says very little about his experience with reporting delays by child witnesses. Without any numbers or descriptions of relevant cases, generic experience or raw numbers say nothing about systematization or the statistical significance of that experience, much less "inquiry, analysis or experiment" (*People* v. *Hogan* (1982) 31 Cal.3d at p. 852) on the matter. The CALICO Center used in this case to provide for child interviews by dedicated child professionals, not police officers, is further indication raw interview experience does not necessarily equate to experience in childhood trauma.

These opinions were also clearly expert in nature. (Evid. Code, § 801, subd. (a) [defining proper subjects of expert testimony].) Souza's categorical-sounding testimony was closely akin to testimony on facets of Rape Trauma Syndrome (RTS) or Child Sexual Abuse Accommodation Syndrome (CSAAS), except that no limiting instruction was given on the

32

matter here, permitting jurors to consider the testimony to resolve gaping credibility questions raised by Allena's changing accounts. (See CALJIC No. 10.64.)[15]

The trial court erred in determining a few questions on cross-examination showing six months' experience in a special victims unit demonstrated Souza's qualifications to describe the length of reporting delays by child witnesses. The testimony was tailor-made to dovetail with the weaknesses in the prosecution case here. The answer to the prosecutor's problem in this case was to offer appropriately founded rebuttal expert testimony on CSAAS, with adequate limiting instruction, not last-minute police testimony to counter the defense case without any limiting instruction.

---

[15] The general, categorical sounding nature of this testimony also differs from typical lay opinion testimony, which is supposed to be stated in the least possible level of generality or abstraction possible. (*People* v. *Hurlic* (1971) 14 Cal.App.3d 122, 127.)

# EXHIBIT COVER PAGE:

Exhibit: _____D_____

Description of this exhibit: Count of APReal's OPinion

Number of pages of this exhibit: __15__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

__✓__ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. D

Filed 2/18/05  P. v. Franks CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>RAYMOND FRANKS,<br><br>　　　Defendant and Appellant. | A104441<br><br>(Alameda County<br>Super. Ct. No. 145147) |

A jury convicted defendant Raymond Franks of four sex abuse counts committed against two minor stepdaughters. The trial court sentenced him to 18 years in state prison. Defendant contends that his conviction and sentence resulted from procedural, evidentiary, instructional, and sentencing errors. Although we hold that the judgment included a no-contact order that requires modification on remand, we affirm the judgment in all other respects.

## I. BACKGROUND

Defendant was charged by amended information with one count of committing continuous sexual abuse of A.M., a child under the age of 14 (Pen. Code, § 288.5, subd. (a); count one), two counts of committing lewd and lascivious acts on A.M. (Pen. Code, § 288, subd. (c)(1); counts two and three), and one count of committing a lewd and lascivious act on Ashlee O., a child under the age of 14 (Pen. Code, § 288, subd. (a); count four). The amended information further alleged that defendant suffered four prior felony convictions and had served two prior prison terms.

Defendant pleaded not guilty and denied all the allegations. Jury trial commenced on August 13, 2003.

## A. Prosecution Case

### 1. Counts One Through Three

A.M. moved in with her mother, Audrey, her brother, Samuel M., and defendant, her stepfather, in July 2000, about a week after she turned 13 years old. They lived in a two-bedroom apartment on East 18th Avenue in Oakland.

A few months after moving in, A.M. fell asleep listening to music on the living room floor. Her mother was out of the house and her brother was asleep in another room. A.M. was awakened by defendant massaging her chest over her pajama top. He lifted her top and bra and fondled her chest with his hand and sucked her bare breast. A.M. was scared and pretended to be asleep.

A.M. and her mother testified about a second incident that occurred in the East 18th Avenue apartment before A.M. turned 14. Defendant entered A.M.'s bedroom at night. He fondled her breast outside of her pajamas, then moved her bra to the side, touched her bare breast, and sucked her nipple. Audrey awoke that night and noticed that defendant was not in bed. Concerned about A.M.'s safety, she got out of bed and began looking for defendant. She looked in the bathroom and kitchen-living room area, but did not see him. She stood in the doorway of the children's bedroom and looked in. She could see the window straight ahead, but could not see to the left where the children's bunk beds were. She did not see anyone standing at the window. Audrey sat down in the bathroom where she could observe someone coming out of any of the rooms. She saw defendant come out of the children's room, and asked him what he was doing. He said, "I was closing the bedroom window." Audrey entered A.M.'s bedroom, asked her why she was awake, checked her heart rate, and told her to go back to sleep.

A.M. testified to a third incident that occurred before her 14th birthday. A.M.'s mother and brother were asleep in their bedrooms. She fell asleep on the couch. Defendant walked into the living room and rubbed her chest outside and possibly under

her pajamas. He also propped her leg up, pulled down her pants and underwear, and rubbed her vagina with his hand.

A.M. could not recall in detail any other incidents that occurred before her 14th birthday, but she testified that defendant would put his hands on her chest four or five times per month and that he touched her vaginal area once or twice per month, always while she was sleeping.

A.M. recalled two specific incidents that occurred after her 14th birthday. In one, defendant touched and sucked her nipples, pulled down her pants, and orally copulated her after she had fallen asleep on the couch. A.M. recalled a final incident after the family had moved to a residence on 66th Avenue in which defendant approached her as she was sleeping in her bedroom. He pulled down her pants and underpants, and orally copulated her. A.M. testified that, besides these two molestation incidents, there were "too many [others] in between" for her to remember.

Audrey asked A.M. numerous times if defendant had inappropriately touched her, but A.M. was afraid to tell her mother and always denied it. She did tell her brother and a friend that defendant was molesting her. On February 6, 2003, A.M. reported the molestations to her church pastor who contacted the police.

### 2. Count Four

In June 2002, Audrey's 11-year-old daughter, Ashlee O., moved into the 66th Avenue house. Every night before bedtime, Ashlee O. climbed into defendant's lap and hugged and kissed him goodnight. In October 2002, Ashlee O. crawled into defendant's lap to say goodnight. As Ashlee O. gave defendant a hug, defendant sucked on her neck for about 20 seconds, leaving a hickey. Ashlee O. was afraid to say anything.

The next morning, Audrey noticed the hickey. She asked Ashlee O., "Who did that to your neck?" Ashlee O. told her defendant had given her the hickey. Audrey immediately confronted defendant in private about it. He did not admit or deny causing the hickey. Audrey spoke to her church pastor about this incident. He convinced her that she and defendant should deal with it through their ongoing marital counseling with the pastor. Audrey instructed Ashlee O. and A.M. not to hug and kiss defendant goodnight

3

anymore. Defendant admitted to the church pastor during counseling that he had given Ashlee O. the hickey, but suggested that Audrey had misinterpreted it.

## B. Defense Case

Defendant acknowledged prior drug convictions leading to a prison term in 1988, as well as a fight in 1997, which led to a battery conviction for injuring his daughter, N.F. Defendant was still on probation for the latter conviction at the time of his arrest. Defendant also admitted giving Ashlee O. the hickey, as she had testified. He explained that his daughters had a problem bathing. That evening, Ashlee O. told him to smell her neck. So he smelled her neck and kissed her, making a smacking sound. She laughed so he kissed her again until he left the mark.

Defendant often went into the children's bedroom at the 18th Avenue apartment to close the blinds or the closet door. On the night Audrey confronted him, he had been in the bathroom, not the children's room. Audrey told him she had a dream or a bad feeling A.M. had been touched; she explained that her first husband had touched her younger sister. Defendant denied molesting A.M., or touching her inappropriately at any time.

Defendant and Audrey had argued over money shortly before A.M. reported the alleged molestations. Audrey had threatened to call the police on him. To defendant's knowledge, A.M. had never previously called the church pastor to schedule an appointment.

By stipulation, a videotape of a multidisciplinary interview taken of A.M. about the alleged molestations was played for the jury. Contrary to her trial testimony, A.M. told the interviewer there was no touching of her vagina, only a touching of her inner thigh, although she was not positive about that. Aside from the first incident in the living room, she did not describe in detail any further incidents that occurred when she was 13. Contrary to her trial testimony, she stated that the oral copulations only occurred after they left the apartment.

A friend of A.M.'s, V.D., recalled a conversation that took place a year before A.M.'s report to the church pastor. A.M. told V.D. about only one incident in which she believed defendant touched her. A.M. told her she was not sure if it really happened

4

because she was asleep. She stated that she thought defendant might have licked her private part one time.

Defendant's daughter, N.F., testified that on more than one occasion in 2002, A.M. told her that she had been molested by her biological father several times. A.M. never told N.F. that defendant molested her. N.F. also testified that A.M. and her brother were scared of Audrey and that she had seen Audrey discipline the children physically, including whipping A.M. with a belt. Another biological daughter of defendant's, R.F., testified to the same effect.

The church pastor testified that defendant completed a church substance abuse program in exemplary fashion eight years earlier, and that defendant ended up being an ordained minister and a leader in the church.

## C. Verdict and Sentencing

The jury found defendant guilty on all counts. Defendant admitted having suffered the four prior convictions and being on probation at the time he committed the charged offenses. The trial court sentenced defendant to a total of 18 years in state prison, consisting of the upper term of 16 years on count one, to be served consecutively to a two-year midterm sentence on count four. This timely appeal followed.

## II. DISCUSSION

## A. Penal Code Section 868.5

Ashlee O. and A.M. were each accompanied by a support person when they testified at trial. The trial court did not require the prosecution to make a preliminary showing of either witness's need for the support person. Although he made no objection to it at trial, defendant contends that this procedure violated his Sixth Amendment right to confrontation as well as his right to a fair trial.

Penal Code section 868.5 provides in relevant part: "Notwithstanding any other law, a prosecuting witness in a case involving a violation of Section . . . 288 [or] 288.5 . . . shall be entitled, for support, to the attendance of up to two persons of his or her own choosing . . . at the trial . . . during the testimony of the prosecuting witness. Only one of

5

those support persons may accompany the witness to the witness stand . . . ." (Pen. Code, § 868.5, subd. (a).)

The legal principles governing the use of a support person at trial were discussed in *People v. Lord* (1994) 30 Cal.App.4th 1718, 1721: "In *People v. Adams* (1993) 19 Cal.App.4th 412, the court rejected a constitutional challenge to California's support person statute, but held there must be a case-specific showing of necessity for support via an evidentiary hearing. The court found this necessity requirement in *Coy v. Iowa* (1988) 487 U.S. 1012, 1021, which required individualized findings of necessity to justify child testimony from behind a screen, and *Maryland v. Craig* (1990) 497 U.S. 836, 855–856, which required an evidentiary hearing to determine whether child testimony on one-way closed circuit television was necessary to protect the child. (*People v. Adams,* . . . at pp. 443–444.)"

In *People v. Lord,* another panel of this District held that the defendant waived the right to a necessity hearing by failing to request a hearing or to otherwise object to the support person's presence in the absence of such a hearing. (*People v. Lord, supra,* 30 Cal.App.4th at p. 1722.) We agree with the holding in *People v. Lord* and find it directly applicable to this case.

First, the courts have no sua sponte duty to insure that a showing of necessity is made. Contrary to defendant's suggestion, *Maryland v. Craig* does not hold to the contrary. The defendant in that case timely objected. (*Maryland v. Craig, supra,* 497 U.S. at p. 842.) Second, a necessity hearing cannot be persuasively analogized to the showing of foundational facts necessary to support the admissibility of evidence. (See, e.g., Evid. Code, §§ 402, 403, subd. (a) [proponent of proffered evidence has burden of producing evidence as to the existence of disputed preliminary fact].) The presence of a support person is a statutory right granted to the complaining witness, not an item of evidence one party seeks to introduce against another. A witness's request to exercise that right places no burden on the prosecution or the court in the absence of a request by the defense that the witness's necessity for a support person be shown.

Defendant's additional arguments against applying the waiver rule are without merit. He was not excused from objecting because the law is unsettled. The law is not unsettled as to whether a defendant may require some type of antecedent showing before a support person is allowed to accompany a witness. We also find nothing in the record to suggest that defendant was prevented from making a timely objection, that any such objection would have been futile, or that an objection would have necessarily exposed defendant to the risk of alienating the jury. He could have requested a bench conference to raise the issue, and he had ample warning to do so because a support person had also been present at the preliminary hearing.

By not objecting, defendant deprived the trial court of the opportunity to make an evidence-based finding as to the witnesses' need for a support person. (*People v. Lord*, *supra*, 30 Cal.App.4th at p. 1722.) He has therefore waived the issue. (*Ibid.*)

## B. Admission of Officer Souza's Testimony

Oakland Police Officer Anthony Souza, who investigated A.M.'s molestation allegations, was called as a defense witness. On cross-examination by the prosecutor, Souza testified that he was assigned to the department's Special Victims Unit and was responsible for investigating cases involving sexual assaults and child sexual abuse. Without objection, Souza testified that child sexual abuse victims frequently do not provide all of the details about what occurred to them when they are initially interviewed. He explained that child victims are often very traumatized and know that the accusations they are making will severely affect their families. According to Souza, such children tend to be more willing to provide details and are better able to remember events after they have had more contact with law enforcement.

Defendant contends the trial court erred in allowing Souza to so testify absent any sufficient showing of his expert qualifications in this area. He points out that Officer Souza testified he had only been with the Special Victims Unit for six months, had received no prior training in child sexual abuse cases, and had only investigated 200 cases involving child sexual abuse.

Defendant waived his present claim by failing to raise it in the trial court. At the outset of her cross-examination, the prosecutor asked Souza how many child sexual assault cases he had investigated. Defendant objected on grounds of relevance. The prosecutor explained that defendant had raised an issue concerning the lack of detail in A.M.'s initial statements, and the prosecution wished to lay a foundation for Souza to explain why that might be the case. Defendant did not object to allowing Souza to testify on that subject, and did not object to Souza's qualifications to testify as he did. Defendant's failure to make a timely and specific objection on the ground now raised waives the objection. (*People v. Bolin* (1998) 18 Cal.4th 297, 321.)

In any event, defendant's belated objection is not well taken. The challenged testimony constituted general opinion testimony based on Officer Souza's own experiences with child abuse victims. It did not rise to the level of expert opinion testimony. Defendant's further claim—that the testimony was "closely akin" to expert testimony on rape trauma syndrome or child sexual abuse accommodation syndrome and therefore should have been accompanied by a limiting instruction—is also unpersuasive. Souza offered no expert testimony on either subject.

Defendant's ineffective assistance of counsel claim also falls short. To support such a claim, the record must establish that there was no possible tactical justification for trial counsel's failure to object. (See *People v. Majors* (1998) 18 Cal.4th 385, 403.) Here, the prosecution sought only to elicit general opinion testimony based on Souza's experiences with child victims. Counsel's failure to object to such testimony was not unreasonable per se. Furthermore, it is not reasonably probable that the trial court would have excluded the testimony, or that the outcome of the trial would have been more favorable to defendant, had such objection been made. (See *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

## C. Penal Code Section 288.5 Instructions

Defendant challenges the following instruction given to the jury concerning the continuous sexual abuse count of which he was convicted: "In the crime charged in Count One, Continuous Sexual Abuse of a Child and the crime of Battery, which is a

8

lesser crime, there must exist a union or joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

The People concede that continuous sexual abuse is a specific intent crime when it is predicated, as it was in this case, on the theory that defendant committed three or more lewd or lascivious acts against a child under the age of 14.[1]  However, any error in giving the above-quoted general intent instruction was in our view rendered harmless in light of the instructions as a whole and the manner in which the prosecution argued the case to the jury. In addition to the above-quoted instruction, the trial court also delivered a lengthier and more detailed instruction defining the terms used in section 288.5 and the elements required to prove defendant was guilty of violating it. The latter instruction explained that a "lewd or lascivious act" requires "the specific intent to arouse, appeal to, or gratify the sexual desires of either party." In her summation to the jury concerning count one, continuous sexual abuse, the prosecutor relied solely on the second instruction and made no reference to count one as a potential general intent crime. The only theory the prosecution advanced in connection with count one was that defendant committed three or more lewd or lascivious acts against A.M. The prosecutor explained that it was the People's burden to prove the requisite special intent in connection with each act A.M. described, and asked the jury to infer that intent from the nature of the acts themselves.

---

[1] Penal Code section 288.5 provides in relevant part as follows: "Any person who . . . resides in the same home with the minor child . . . who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years . . . , or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years . . . is guilty of the offense of continuous sexual abuse of a child." The crime of committing a lewd or lascivious act against a child requires the specific intent of "arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] or the child." (Pen. Code, § 288; *People v. Fox* (2001) 93 Cal.App.4th 394, 396–397.)

We perceive no reasonable likelihood that the jury convicted defendant of continuous sexual abuse based on a misimpression that the prosecution needed only to prove his general intent to do the acts alleged.

## D. Failure to Give CALJIC No. 17.10

The trial court instructed on battery as a lesser included offense to all the charges. The court's instructions defined battery and specified that it was a lesser offense that the jury should consider on its verdict form if it found the defendant not guilty of the crime charged.[2] Defendant contends the trial court erred in failing to also instruct the jury under CALJIC No. 17.10 that it could convict defendant of the lesser offense if it was not satisfied beyond a reasonable doubt that he was guilty of the crimes charged.[3]

Viewed as a whole, the jury instructions made it clear that if the jury did not find each element of the charged offenses beyond a reasonable doubt, the jurors were then required to consider whether the elements of battery were proven beyond a reasonable doubt. In any event, any error in failing to give CALJIC No. 17.10 or a similar instruction was harmless. On the record before us, it is not reasonably probable that the jury would have returned a verdict of battery on any count had it received such an

---

[2] The instructions given stated in relevant part: "If you find the defendant not guilty of the felony charged, you then need to complete the verdict on the lesser included offense by determining whether the defendant is guilty or not guilty of the lesser included crime . . . ."

[3] CALJIC No. 17.10 provides in relevant part: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict [him] [her] of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime. [¶] [The crime of _____ [as charged in Count _____] is lesser to that of _____ charged in Count _____.] [¶] . . . [¶] Thus, you are to determine whether . . . defendant . . . is . . . guilty or not guilty of the crime[s] charged [in Count[s] _____] or of any lesser crime[s]. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict[s]. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the [charged] [greater] crime."

instruction. It is apparent that the jury believed A.M.'s testimony regarding the five specific incidents. That testimony, combined with Ashlee O.'s testimony, defendant's admission that he caused Ashlee O.'s hickey, and the corroboration provided by A.M.'s mother, her friend, V.D., and her brother, all furnished considerable evidence of lewd acts and no evidence of simple battery. The verdict and judgment are not undermined by the trial court's failure to give CALJIC No. 17.10.

## E. Use of CALJIC No. 2.21.2

Defendant contends the trial court erred in instructing the jury with CALJIC No. 2.21.2 concerning the truthfulness of witnesses.[4] He asserts that this instruction impermissibly lessens the People's burden of proof by allowing the jury to use a lesser "probability" standard to evaluate the witnesses' testimony.

We agree with the appellate court in *People v. Foster* (1995) 34 Cal.App.4th 766 that CALJIC No. 2.21.2 " ' "does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute." ' " (*Id.* at p. 775.) It was accompanied in this case by: (1) CALJIC No. 1.01, which instructed the jury to "[c]onsider the instructions as a whole, and each in light of all the others"; and (2) CALJIC No. 2.90, which defined "reasonable doubt" for the jury as "that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, of the truth of the charge." Considering the instructions as a whole, no reasonable juror would have construed CALJIC No. 2.21.2 to allow a guilty verdict on a finding that the defendant was probably guilty, rather than guilty beyond a reasonable doubt. (See *People v. Wade* (1995) 39 Cal.App.4th 1487, 1494.)

---

[4] The trial court instructed the jury as follows under CALJIC No. 2.21.2: "A witness who is willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

## F.  Cumulative Error

Any possible errors in the giving of an extraneous general intent instruction in reference to count one, or in failing to give CALJIC No. 17.10, were harmless whether considered individually or in combination.  Finding no other potential errors to cumulate, we therefore reject defendant's argument that cumulative error deprived him of a fair trial or warrants reversal of the verdict in whole or in part.

## G.  No-Contact Order

The judgment sentencing defendant to state prison included the following no-contact orders:  (1) "Defendant is to have no contact with minor/victim pursuant to Penal Code section 1202.05"; and (2) "Defendant prohibited all contact with minor females under age of 18."  Defendant objects to the latter order.  Conceding that such an order might be permissible as a condition of probation, he contends that it is unauthorized by statute and unconstitutional when imposed as a lifetime ban as part of a judgment sentencing him to state prison.  Defendant points out that the prohibition appears to apply regardless of future circumstances or rehabilitation and that, unlike the no-contact rule required by section 1202.05, it lacks exceptions or provisions for modification.

The People argue unpersuasively that the subject order is authorized by Penal Code section 136.2.  Section 136.2 authorizes any court with jurisdiction over a criminal matter which has a "good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur," to issue an order prohibiting the defendant from any "communication whatsoever with any specified witness or any victim, except through an attorney under any reasonable restrictions that the court may impose." (Pen. Code, § 136.2, subd. (d).)  In this case, the trial court made no finding that harm to or intimidation of a victim or witness was likely to occur.  The prohibition it imposed on defendant—barring his contact with any female under the age of 18—sweeps far beyond the victims and witnesses involved in defendant's criminal proceeding.  There is also authority that section 136.2 only authorizes trial courts to enter protective orders prior to or during trial, and that it has no application after the defendant has been convicted.  (See *People v. Stone* (2004) 123 Cal.App.4th 153, 159–160.)

12

On these grounds, we find that the portion of the judgment prohibiting defendant from contact with females under the age of 18 was unauthorized by statute and in excess of the trial court's jurisdiction. Rather than strike the order, we will adopt defendant's proposal that it be recast as a visitation restriction. We decline the People's suggestion that the order be refashioned into a non-binding recommendation for a parole condition. Appropriate parole conditions should be determined by the Department of Corrections and Board of Prison Terms at the time of defendant's release.

## H. Blakely Issue

Defendant claims that the trial court erred under *Blakely v. Washington* (2004) 542 U.S. ___ [124 S.Ct. 2531] (*Blakely*) in imposing the 16-year upper term of imprisonment for his Penal Code section 288.5, subdivision (a) violation based on facts that were neither found by the jury nor admitted by him.

Without reaching the question of whether defendant's constitutional rights pursuant to the *Blakely* opinion were violated, we find that he did not suffer prejudice from the imposition of the upper term upon him without a separate finding by the jury of aggravating circumstances beyond a reasonable doubt. We do not consider the denial of *Blakely* jury trial rights during sentencing proceedings to be a "structural defect," not amenable to harmless error review.[5] Under a harmless error analysis, we find that

---

[5] In *Arizona v. Fulminante* (1991) 499 U.S. 279, "a majority of the high court, in discussing the applicable harmless error standard for constitutional errors, distinguished 'trial error,' that is, an error which 'occur[s] during the presentation of the case to the jury,' from 'structural defects,' such as denial of a public trial, which 'affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself.' The former errors are subject to *Chapman* analysis (see *Chapman v. California* (1967) 386 U.S. 18, 24 [error or deprivation must be shown harmless beyond reasonable doubt]), whereas the latter errors are deemed reversible per se." (*People v. Woodward* (1992) 4 Cal.4th 376, 387.) "There is a strong presumption any error falls within" the *Chapman* category, "and it is the rare case in which a constitutional violation will not be subject to harmless error analysis." (*People v. Marshall* (1996) 13 Cal.4th 799, 851.) "In only a few cases has the Supreme Court found a constitutional violation which is not subject to harmless error analysis." (*People v. Evans* (1998) 62 Cal.App.4th 186, 194.)

defendant would have been sentenced to the upper term even without the trial court's finding of any aggravating factors in violation of *Blakely*.

In *Blakely*, the United States Supreme Court applied the rule articulated in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), that " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Blakely, supra*, 124 S.Ct. at p. 2536, italics added.) Nothing in *Blakely* casts doubt on the exclusion of prior conviction allegations from the constitutional right to jury trial. The California Supreme Court has consistently held that neither the federal nor state constitutions confer the right to have a jury determine any factual issues relating to prior convictions alleged for purposes of sentencing enhancement. (See, e.g., *People v. Kelii* (1999) 21 Cal.4th 452, 455; *People v. Vera* (1997) 15 Cal.4th 269, 277; *People v. Wiley* (1995) 9 Cal.4th 580, 585.) The exception has been found to apply not only to the fact of a prior conviction, but to "an issue of recidivism which enhances a sentence and is unrelated to an element of a crime." (*People v. Thomas* (2001) 91 Cal.App.4th 212, 223.) "Courts have not described *Apprendi* as requiring jury trials on matters other than the precise 'fact' of a prior conviction. Rather, courts have held that no jury trial right exists on matters involving the more broadly framed issue of 'recidivism.' [Citations.] Appellate courts have held that *Apprendi* does not require full due process treatment to recidivism allegations which involved elements merely beyond the fact of conviction itself." (*People v. Thomas*, at pp. 221–222.)

Here, the defendant admitted that he had suffered four prior convictions, served two prior prison terms, and was on probation at the time he committed the charged sex crimes. The trial court additionally found as matters in aggravation that defendant's prior convictions as an adult were "numerous and of increasing seriousness," and that his "prior performance on probation and parole [were] unsatisfactory." In our view, these recidivist factors standing alone justified the trial court's selection of the upper term on count one. "California courts have long held that a single factor in aggravation is sufficient to justify a sentencing choice, including the selection of an upper term . . . ."

14

.(*People v. Brown* (2000) 83 Cal.App.4th 1037, 1043.) On the record before us, we are convinced beyond a reasonable doubt that the trial court would have imposed the upper term even without finding or considering any of the non-recidivist facts that might have required a jury trial under *Blakely*. Thus, even if some of the aggravating factors the trial court cited required jury findings under *Blakely*, its imposition of an upper term sentence was nonetheless constitutionally valid and not prejudicial to defendant.[6] (See *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1263–1264; *People v. Williams* (1996) 46 Cal.App.4th 1767, 1782–1783.)

## III. DISPOSITION

We remand the matter with instructions that the abstract of judgment be amended to strike the order prohibiting defendant from contact with minor females under the age of 18 and substitute in its place a prohibition on any visitation with minor females under the age of 18. In all other respects, the judgment is affirmed.

_____
Margulies, J.

We concur:


_____
Stein, Acting P.J.


_____
Swager, J.



_____

   [6] The most recent Supreme Court case discussing the principles applied in *Blakely*, *United States v. Booker* (2005) ___ U.S. ___ [125 S.Ct. 738], does not affect our analysis in this case.

# EXHIBIT COVER PAGE:

Exhibit: ___E___

Description of this exhibit: Appellate Court Case Information
(Computer Print-out Sheet) Regarding
Petition for Review

Number of pages of this exhibit: __1__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

__✓__ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. E



# CALIFORNIA APPELLATE COURTS
### Case Information

| Welcome |
| Search |
| E-mail |
| Calendar |
| Help |
| Opinions |

C|C
home

## Court Case Search Results - Supreme Court

**PEOPLE v. FRANKS**
**Case Number S132439**

Court data last updated: 05/14/2005 09:53 PM

## Docket Entries (Register of Actions)

| Date | Description | Notes |
|------|-------------|-------|
| 03/22/2005 | Petition for review filed | by counsel for aplt. (Raymond Franks) |
| 03/23/2005 | Record requested | |
| 04/06/2005 | Received Court of Appeal record | file jacket/briefs/sealed envelope/envelope of exhibits/accordian file |
| 04/27/2005 | Petition for review denied | Petition for review denied without prejudice to any relief to which defendant might be entitled after this court determines in People v. Black, S126182, and People v. Towne, S125677, the effect of Blakely v. Washington (2004) __ U.S.__ 124 S.Ct. 2531, on California law. |

## Detailed Information

| Select item to view below | |
|---|---|

© 2004 Judicial Council of California

# EXHIBIT COVER PAGE:

Exhibit: _____F_____

Description of this exhibit: Supreme Court (Calif.) Order denying
State habeas Corpus Petition, No. S144714

Number of pages of this exhibit: ___1___ pages

JURISDICTION: (Check only one)

_____ Municipal Court

__✓__ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. F

S144714

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re RAYMOND FRANKS, JR. on Habeas Corpus

Petition for writ of habeas corpus is DENIED.

SUPREME COURT
FILED

FEB - 7 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

# EXHIBIT COVER PAGE:

Exhibit: ___G___

Description of this exhibit: State habeas Corpus No. S144714

Number of pages of this exhibit: ___1___ pages

JURISDICTION: (Check only one)

_____ Municipal Court

__√__ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. G

Name **FRANKS RAYMOND**

Address **C.S.P. Solano**

**P.O.Box 4000 Vacaville, CA.**

**95696-4000**

CDC or ID Number **V-08354**

SUPREME COURT
# FILED

JUN 2 9 2006

Frederick K. Ohlrich Clerk

E. P

DEPUTY

CLERK SUPREME COURT

RECEIVED
JUN 2 9 2006

_____

_____

*(Court)*

**RAYMOND I. FRANKS JR.**
Petitioner

vs.

**D. K. SISTO, WARDEN**
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. **S144714**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before answering any questions.*

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

**PETITION FOR WRIT OF HABEAS CORPUS** | WEST GROUP Official Publisher | Penal Code, § 1473 et seq.; Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

- [X] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [ ] Other (specify): _____
- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name: RAYMOND I. FRANKS JR

2. Where are you incarcerated? California State Prison Solano

3. Why are you in custody? [X] Criminal Conviction   [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   LEWD ACT UPON A MINOR

b. Penal or other code sections: 288.5  288

c. Name and location of sentencing or committing court: Superior Court of California, County of Alameda
   Rene C. Davidson Courthouse 1225 Fallon St. Oakland, CA. 95612

d. Case number: #145147

e. Date convicted or committed: 10/2/03

f. Date sentenced: 10/2/03

g. Length of sentence: 18 years

h. When do you expect to be released? 2019

i. Were you represented by counsel in the trial court? [X] Yes.   [ ] No.  If yes, state the attorney's name and address:
   ATTORNEY AT LAW THOMAS BROOME  1330 BROADWAY, STE. 833
                                   OAKLAND, CA. 94612

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)

INCOMPETENCE OF COUNSEL (SEE ATTACHED EXHIBIT A pg #)

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See In re Swain (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

MY COUNSEL (THOMAS BROOME) AFTER HIS INTERVIEW WITH ME
(HIS CLIENT) FAILED TO USE THE INFORMATION OR FACTS I
HAD GIVEN HIM. THOMAS BROOME ALSO HIRED A PRIVATE INVESTIGATOR
HARVEY YARBROUGH TO INTERVIEW ANDREW FRANK, IN WHICH HE
DID SO WITH "NO" PEN OR PAPER OR CASSETTE TAPE TO RECORD STATEMENT.
THOMAS BROOME HAD NO STRATEGIES OR TACTICAL JUSTIFICATION
IN HIS DECLARATIONS. IF SOMEHOW THOMAS BROOME WERE REQUIRED
TO PRESS FURTHER OBJECTION TO PRESERVE THE CLAIM, BROOM'S
FAILURE TO DO SO DEPRIVED ME OF THE EFFECTIVE ASSISTANCE
OF COUNSEL WITHOUT CONCEIVABLE TACTICAL JUSTIFICATION,
WARRANTING RELIEF ON DIRECT APPEAL.

_____

_____

b. Supporting cases, rules, or other authority (optional):
(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

PEOPLE V. LEDESMA (1987) 43 CAL. 3d 171, 215-218.
PEOPLE V. STRATTON (1988) 205 CAL. APP. 3d 87, 90.
IN re fields (1990) 51 Cal. 3d 1063, 1069-1070; U.S. CONST. amends VI, XIV
BERRYMAN V. MORTON (3rd Cir. 1996) 100 F. 3d 1089, 1095-1096.

7. Ground 2 or Ground _____ (if applicable): (SEE ATTACHED EXHIBIT A BCC)

THE COURT ERRED IN INSTRUCTING THE JURY WITH CALJIC NO. 2.21.2, BECAUSE THE INSTRUCTION PERMITTED EVALUATION OF THE PIVOTAL PROSECUTION TESTIMONY BY A PROBABILITY STANDARD, DENYING APPELLANT DUE PROCESS OF LAW.

a. Supporting facts:

THE COURT INSTRUCTED THE JURY WITH CALJIC NO. 2.21.2 WHICH PROVIDES IN PERTINENT PART THAT "YOU MAY REJECT THE WHOLE TESTIMONY OF A WITNESS WHO WILLFULLY HAS TESTIFIED FALSELY TO A MATERIAL POINT UNLESS, FROM ALL THE EVIDENCE, YOU BELIEVE THE "PROBABILITY" OF TRUTH FAVORS HIS OR HER TESTIMONY IN OTHER PARTICULARS." CT 141; RT 1098. DISPOSITIVE CREDIBILITY QUESTIONS MUST BE RESOLVED BEYOND A REASONABLE DOUBT, NOT UNDER A PROBABILITY STANDARD MORE SUITED TO FOUNDATIONAL EVIDENTIARY ISSUES AS SET FORTH IN THE CURRENT CALJIC NO. 2.21.2. CALJIC NO. 2.21.2 PERMITS JURORS TO APPLY A PROBABILITY STANDARD TO THE DISPOSITIVE TESTIMONY IN A CASE.

[TERM "PROBABILITY" IMPLIES A STANDARD OF PREPONDERANCE OF THE EVIDENCE].

b. Supporting cases, rules, or other authority:

PEOPLE V. NAKAHARA (2003) 30 CAL. 4TH 705, 714.
PEOPLE V. HILLHOUSE (2002) 27 CAL. 4TH 469, 493
PEOPLE V. RIVERS (1993) 20 CAL. APP 4TH 1040, 1046.
PEOPLE V. RIVERS, SUPRA, 20 CAL. APP. 4TH AT PP. 1045-1046
2 McCORMICK, EVIDENCE (4TH ed 1992) ch. 36, p. 437-439

THE TRIAL COURT PREJUDICIALLY ERRED IN FAILING TO GIVE CALJIC NO. 17.10 REGARDING THE LESSER BATTERY OFFENSE, DENYING APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL.

a. Supporting facts:

As NOTED, THE COURT INSTRUCTED ON BATTERY (PEN. CODE, § 242) AS A LESSER OFFENSE TO ALL THE CHARGES. (CT 142, 146, 148-149; RT 1100, 1107 1108, 1111.) HOWEVER, THE INSTRUCTIONS GIVEN MERELY DEFINED BATTERY AND SPECIFIED IT WAS A LESSER OFFENSE FOR PURPOSES OF THE VERDICT FORMS. THE COURT DID NOT GIVE CALJIC NO. 17.10 OR ANY INSTRUCTION LIKE IT ADDRESSING HOW THE JURY SHOULD EVALUATE LESSER OFFENSES. THIS WAS ERROR. THE ERROR FURTHER DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND A FAIR TRIAL. PART OF THE PURPOSE OF CALJIC NO. 17.10 IS TO EXPRESSLY ADVISE THE JURY "THAT IT MUST CHOOSE THE LESSER OFFENSE IF IT ENTERTAINS ANY REASONABLE DOUBT AS TO THE GREATER."

b. Supporting Cases, rules, or other authority:

U.S. Const. amends. V, XIV; Cal. Const., art. I, §§ 7, 15.
People v. Gonzalez (1983) 141 Cal. App. 3d 786, 793.
People v. Gonzalez, supra, 141 Cal. App 3d at p 744
Mandatory Criminal Jury Instructions (C.J.E.R. 1997)
§ 2.125, P.90
People v. Owen (1991) 226 Cal. App. 3d 996, 1004 [cit. om.]
People v. Brew (1991) 2 Cal. App. 4th 99, 106

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
COURT OF APPEAL   FIRST APPELLATE DISTRICT   DIVISION ONE

b. Result: PETITION FOR REVIEW DENIED     c. Date of decision: 4/27/05

d. Case number or citation of opinion, if known: # S132439

e. Issues raised:  (1) DENIED SIXTH AMENDMENT

(2) THE TRIAL COURT ERRED PREJUDICIALLY IN FAILING TO GIVE CALJIC NO. 17.10

(3) INCOMPETENCE OF COUNSEL

f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
JOSEPH SHIPP  P.O. BOX 20347  OAKLAND, CA. 94620

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.  If yes, give the following information:

a. Result: N/A     b. Date of decision: N/A

c. Case number or citation of opinion, if known: N/A

d. Issues raised:  (1) N/A

(2) N/A

(3) N/A

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
ALL CLAIMS WERE MADE IN THIS APPEAL.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
I SOUGHT REVIEW IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA FIRST APPELLATE DISTRICT   DIVISION ONE.

b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☒ No.
Attach documents that show you have exhausted your administrative remedies.

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: N/A

(2) Nature of proceeding (for example, "habeas corpus petition"): N/A

(3) Issues raised: (a) N/A

(b) N/A

(4) Result (Attach order or explain why unavailable): N/A

(5) Date of decision: N/A

b. (1) Name of court: N/A

(2) Nature of proceeding: N/A

(3) Issues raised: (a) N/A

(b) N/A

(4) Result (Attach order or explain why unavailable): N/A

(5) Date of decision: N/A

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
I MISUNDERSTOOD THAT I COULD NOT FILE A FEDERAL HABEAS CORPUS UNTIL I FILED TO THE UNITED STATES SUPREME COURT. (SEE ATTACHED EXHIBIT B)

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
NEXT LEVEL OF APPEAL

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: JUNE 27, 2006

Raymond Franks
(SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]    PETITION FOR WRIT OF HABEAS CORPUS    WEST GROUP Official Publisher    Page six of six

# EXHIBIT COVER PAGE:

Exhibit: _____H_____

Description of this exhibit: Superior Court's Denial Order
(Second Petition)

Number of pages of this exhibit: ___1___ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

__√__ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. H

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA        Dept. No. 9

Date: January 22, 2008        Hon. LARRY GOODMAN, Judge        Fil R. Cruz, Dep.Clk.
                                                               Not Reported, Reporter

IN RE: RAYMOND FRANKS                       Counsel appearing: No Appearance
                    Petitioner              for Petitioner

vs.                                         Counsel appearing:    No Appearance
                                            for Respondent

**PEOPLE OF THE STATE OF CALIFORNIA**

                    Respondent

Nature of Proceedings:  EX PARTE PETITION FOR WRIT OF HABEAS CORPUS/APPPOINTMENT OF
                        COUNSEL

                                            Case # 145147
                                            PFN : BAS571
                                            CEN:3232771

This Court having reviewed the Petition for Writ of Habeas Corpus filed on January 22, 2008 by Petitioner,
RAYMOND FRANKS, NOW HEREBY ORDERS:

Petition for writ of habeas corpus is denied.  "Any issue that was actually raised and rejected on appeal cannot be
renewed in a petition for writ of habeas corpus",(In Re Harris (1993) 5 Cal 4th 829).  The issue of ineffective
assistance of trial counsel was raised and rejected in Petitioner's direct appeal.

Further, the issue of ineffective assistance of trial counsel, raised in petitioner's petition is a repetition of the issue
raised in the petition filed with this court and rejected in 2006. "This court has never condoned abusive writ practice
or repetitious collateral attacks on a final judgment.  Entertaining the merits of successive petitions is inconsistent
with our recognition that delayed and repetitious presentation of claims is an abuse of the writ,"(In Re Clark (1993)
5 Cal 4th 750, 769).

Finally, petitioner has failed to meet his burden in establishing ineffective assistance of appellate counsel.
Petitioner has neither demonstrated that his counsel's conduct failed to conform to an objective standard of
reasonable competence nor has he explained how his counsel's acts or omission resulted in prejudice to petitioner.

<u>CLERK'S CERTIFICATE OF MAILING (CCP 1013a)</u>

I certify that the following is true and correct:  I am a Deputy Clerk employed by the Alameda County Superior
Court. I am over the age of 18 years. My business address is 1225 Fallon Street, Oakland, California. I served this
ORDER REGARDING EX PARTE PETITION FOR WRIT OF HABEAS CORPUS/APPOINTMENT OF COUNSEL,
by placing a copy in an envelope addressed as shown below and then by sealing and placing it for collection,
stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at
Oakland, California, following standard court practices.

                                            Dated:  JAN 2 8 2008

                                            Executive Officer/Clerk of the Court

Raymond Franks                              By: _____
CDC V-08354
California State Prison -Solano             Fil R. Cruz, Deputy Clerk
P.O. Box 4000, bldg., 12, Cell 234
Vacaville, CA 95696

(Rev. 5/3/07)